IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SECURITIES AND EXCHANGE          :
COMMISSION,                      :
                                 :
     Plaintiff,                :
                                 :          CIVIL ACTION NO.
                                 :          1:16-CV-2572-LMM
v.                               :
                                 :
THOMAS CONRAD, STUART            :
CONRAD, FINANCIAL                :
MANAGEMENT CORPORATION,          :
and FINANCIAL MANAGEMENT         :
CORPORATION, S.R.L.,             :
                                 :
     Defendants.               :

## ORDER

This case comes before the Court on Defendants' Motions to Dismiss [8, 9]. The Court held a hearing on the matters on February 13, 2017. After due consideration, the Court enters the following Order:

## I.     BACKGROUND[1]

This matter arises from the allegedly fraudulent operation of a $10.7 million "fund of funds" operated by Defendant Thomas Conrad ("T. Conrad"). Dkt. No. [1] ¶ 1. T. Conrad is the owner and controlling officer of Defendants Financial Management Corporation ("FMC") and Financial Management

---

[1] All facts are construed in a light most favorable to Plaintiff as the non-moving party.

Corporation, S.R.L. ("SRL"). Id. ¶ 9. Defendant Stuart Conrad ("S. Conrad"), T. Conrad's son, is the vice president and member of the Board of Directors for FMC and SRL. Id. ¶ 10.

**General Background**

This is T. Conrad's second appearance in an SEC enforcement action. Id. 18. He was barred from association with any registered broker-dealer in 1971; however, he continues his securities business in an unregistered capacity. Id. ¶ 19. During that earlier enforcement action, the SEC found he was unfit to engage in the securities industry in any capacity and he was suspended from his seat on the Pennsylvania-Baltimore-Washington Stock Exchange for three months. Id. ¶ 56.

The other two primary Defendants are FMC and SRL. T. Conrad formed FMC in 1965 to act as the general partner and unregistered investment advisor for hedge funds he operated. Id. ¶ 11. SRL is a Uruguayan entity operated by T. Conrad which also serves as general partner for T. Conrad's various hedge funds. Id. ¶ 12.

World Opportunity Master Fund, L.P. ("WOF Master"), which is not a party to this action, is a master hedge fund formed by T. Conrad under the laws of the British Virgin Islands. Id. ¶ 13. It began operation in 2008 and became a Nevada limited partnership in 2012. Id.

WOF Master is part of a larger "master-feeder" investment structure known as the WOF master-feeder structure. Id. In such a structure, investors

2

invest in a feeder fund, which in turn invests its assets into the master fund. The master fund then makes all portfolio investments and conducts trading activity.

World Opportunity Fund, L.P. ("WOF"), which is also not a party to this action, is a feeder hedge fund to WOF Master under the WOF master-feeder structure. Id. ¶ 15. T. Conrad created WOF in 1994, and until 2008, it was his only hedge fund. Id. ¶ 21. When T. Conrad created WOF Master in 2008, WOF became its feeder fund. Id. ¶ 22.

World Fund II, L.P. ("World Fund II"), which is similarly not a party to this action, was established in 2011 as a new feeder hedge fund in the WOF master-feeder structure for all new investors other than those holding retirement accounts. Id. ¶ 16. World Opportunity Fund (BVI) Ltd. ("BVI") was established in 2008 as a feeder hedge fund in the WOF master-feeder structure to hold individual retirement accounts. Id. ¶ 17. Investors in these three feeder funds received limited partnership interests in them. Id. ¶ 20.

In 2014, T. Conrad moved all investors of WOF into World Fund II. Id. ¶ 28. He then moved all retirement assets of BVI into WOF, leaving BVI without assets. Id. Therefore, there are currently two active feeder funds feeding into WOF Master: WOF, which holds retirement assets, and World Fund II, which holds non-retirement assets. Id. ¶ 29. As of November 2012, there are 44 limited partners invested in WOF with a purported portfolio worth $5.7 million and 48 limited partners invested in World Fund II with a purported portfolio of $5 million. Id. ¶¶ 30-31.

Before 2014, FMC was the company through which T. Conrad made investment decisions for the WOF master-feeder structure. Id. ¶ 35. Since 2014, SRL has taken that role. Id. Through FMC and SRL, T. Conrad made all investment decisions for the WOF hedge funds. Id. ¶ 36.

S. Conrad acts as the portfolio manager for WOF Master. Id. ¶ 37. In addition to his work for WOF Master, FMC, and SRL, S. Conrad owns Advanced Image Resources, Inc. ("AIR"), a Georgia corporation that produces environmentally friendly printer toner and other products. Id. ¶ 38.

Before investors invest money in the WOF hedge funds, FMC and SRL disclose that they charge each fund an annual management fee ranging between 1.15 percent and 2.18 percent of the fund's total assets. Id. ¶ 39. Additionally, FMC and SRL disclose to investors that they are entitled to receive performance allocations if the fund's performance exceeds certain benchmarks. Id. ¶ 40.

**Allegations of Fraud**

Plaintiff makes five general allegations of fraud. The Court will outline the relevant background information for each.

1. Failure to disclose conflicts and compensation

Plaintiff first alleges that T. Conrad fraudulently failed to disclose certain conflicts and compensation he drew from WOF Master's assets. Specifically, Plaintiff alleges that in January 2013, T. Conrad arranged to increase his compensation from WOF Master by appointing himself to be a sub-manager of approximately 1/3 of the fund's assets. Id. ¶ 41. Because FMC and SRL are the

general partners for the feeder funds, and because T. Conrad controls FMC and SRL, T. Conrad alone evaluates and selects sub-managers for WOF Master's assets. Id. ¶ 45.

According to the Complaint, T. Conrad exacted an additional fee for this position aside and apart from the fee already taken and disclosed by FMC and SRL. Id. ¶ 41. Additionally, the Complaint alleges T. Conrad did not disclose to any investors his appointment to sub-manager, his compensation arrangement, or the fact that he had unilateral authority to appoint himself to the position. Id.

2. Failure to disclose disciplinary history

Next, the SEC alleges that T. Conrad fraudulently failed to disclose his disciplinary history to investors. According to the Complaint, in the "Management" section of the offering memoranda for World Fund II, dated January 2011 and January 2013, T. Conrad represented that he managed the investment portfolio of a non-profit organization since 1965. Id. ¶ 49. In another document, a disclosure brochure for the World Fund II dated approximately January 2012, T. Conrad claimed that FMC has been managing wealth since 1965 and that he himself had a seat on the Philadelphia-Baltimore-Washington Stock Exchange. Id. ¶ 50.

The Complaint alleges that WOF Master marketing materials from 2014 provided details of T. Conrad's background, including his founding and operation of Conrad & Company, a registered broker-dealer, in 1965. Id. ¶ 51. Additionally, Plaintiff claims that, between December 2011 and January 2014, T. Conrad

distributed a series of "Investor Fact Sheets" to solicit investors for World Fund II. Id. ¶ 52. The fact sheet lists T. Conrad's business accomplishments going back to the 1960s. Id. According to the Complaint, Defendants prepared and distributed these materials to investors in connection with the offer and sale of interests in the funds. Id. ¶ 53.

The Complaint further alleges that, during face-to-face and telephonic pitches to prospective investors, Defendants described T. Conrad's experiences as they were detailed in the above-mentioned offering material. Id. ¶ 54. Additionally, the Complaint points to a specific face-to-face encounter in which a prospective investor, who eventually invested $1 million into World Fund II and BVI, met with T. Conrad and asked him whether he had "any skeletons in his closet." Id. ¶ 55. T. Conrad denied having any "skeletons in his closet." Id. ¶ 56.

In each of these instances, Plaintiff contends that T. Conrad, FMC, and SRL failed to disclose: (1) that T. Conrad was barred by the SEC from association with any registered broker-dealer; (2) that the SEC revoked registration of T. Conrad's broker-dealer company, Conrad & Company; (3) that the SEC found T. Conrad to be unfit to engage in the securities business in any capacity based on his actions and his lack of candor; and (4) that he was suspended from the Philadelphia-Baltimore-Washington Stock Exchange for three months in March 1970. Id. ¶ 57. Instead, Plaintiff alleges, the information given to investors provided only the positive information about FMC, SRL, and T. Conrad. Id. ¶ 59.

Related to their failure to disclose disciplinary history, Plaintiff alleges that Defendants fraudulently included false information in their offering materials. In particular, Plaintiff contends that Defendants included information about the "historical positive performance" of some soy bean farms and precious metal investments in the Investor Fact Sheets that the funds had not actually invested in. Id. Additionally, the Investor Fact Sheet from July 2014 purported to describe the six year performance history of World Fund II's current investments by averaging performances from 2014-2009. Id. However, the fund in question was not established until 2011. Id. Lastly, the Investor Fact Sheets claimed to have a third party auditor checking the investments, when in reality, the funds only had a third party accountant that never performed audits. Id. ¶ 60.

3. Failure to disclose loans

Next, Plaintiff alleges that Defendants failed to disclose two transfers made by T. Conrad from fund assets to his family members. According to the Complaint, T. Conrad alone decided how to spend fund assets. Id.¶ 63.

In February 2010, T. Conrad allegedly used fund assets to pay approximately $18,000 in credit card bills incurred by his daughter-in-law. Id. ¶ 65. According to the Complaint, T. Conrad planned to repay the money at 12% interest. Id. In 2012, T. Conrad allegedly arranged for FMC to purchase the loan from WOF Master at face value to remove it from WOF Master's books as an undesirable miscellaneous item. Id. According to Plaintiff, this loan was never disclosed to investors.

In July 2013, T. Conrad allegedly allowed his other son, Dale Conrad, to write himself a $26,500 check from the WOF Master account for the purchase of a truck. Id. ¶ 66. Dale Conrad repaid the money two-months later without interest. Id. This loan was also not disclosed to investors. Id.

4. Fraudulent purchases

Next, Plaintiff alleges that T. Conrad fraudulently purchased several assets in his own name using fund assets. Id. ¶ 67. First, T. Conrad allegedly bought two soy bean farms in Uruguay in his own name using fund assets. Id. ¶ 67. Second, T. Conrad allegedly bought $88,000 worth of precious metals in his own name using fund assets. Id. ¶ 69. According to Plaintiff, none of the offering materials disclose that T. Conrad would hold personal title to assets purchased with investor funds. Id. ¶ 70.

5. Fraudulent redemption practices

Plaintiff alleges that, while denying other investors the ability to withdraw fund assets, T. Conrad allowed friends and family to withdraw assets when needed. Specifically, Plaintiff alleges that in November 2008, T. Conrad sent a notice to investors that FMC was temporarily suspending "all withdrawal, redemptions and termination of capital accounts in the Fund." Id. ¶ 71. In an email dated December 2008, T. Conrad told investors that FMC "cannot disburse any funds to partners unless all are treated equally." Id. ¶ 74. By mid-2012 approximately 29 investors sought to redeem some or all of their investment in the funds. Id. ¶ 73.

According to the Complaint, T. Conrad secretly exempted himself and FMC from the blanket restriction, redeeming roughly $2 million of FMC's investments in the fund for his personal benefit. Id. ¶ 76. He used the redemptions to pay his $180,000 yearly salary, pay his wife's $72,000 yearly salary, and to make a $100,000 down payment on an airplane. Id. ¶ 77. In 2012, T. Conrad redeemed an additional $24,000 from his personal investment in the fund for another down payment on an airplane. Id. ¶ 78.

S. Conrad received $160,000 in redemptions from the fund in 2010. Id. ¶ 80. In 2011, S. Conrad received another $30,000 in redemptions from FMC, drawn from fund assets. Id. ¶ 81. In 2012, T. Conrad redeemed $15,000 from his WOF Master account and transferred the money to S. Conrad. Id. ¶ 82. In April 2012, FMC redeemed $25,000 from its WOF Master account and paid the funds to AIR, S. Conrad's company. Id. ¶ 83. During 2013, and in the first six months of 2014, S. Conrad received approximately $444,000 in redemptions from his WOF Master investments or from T. Conrad/FMC's WOF Master investments. Id. ¶ 85.

At the time of each redemption and receipt, S. Conrad was Director of FMC and the individual funds. Id. ¶ 86. At the time of each redemption and receipt, S. Conrad knew that T. Conrad had notified all investors that redemption requests were suspended. Id. ¶ 87. S. Conrad knew that the funds he received came from redemptions either from his own investments in the fund or from T. Conrad/FMC's investments in the fund. Id. ¶ 89. Additionally, S. Conrad knew that the investors were not being informed of his redemptions. Id. ¶ 91.

Beyond redemptions for his family, Plaintiff alleges that T. Conrad allowed redemptions for favored investors. Id. ¶ 92. In June 2013, WOF Master loaned $20,000 to an investor labeled Investor A. Id. ¶ 93. Investor A was a co-owner of S. Conrad's business, AIR. Id. When Investor A did not repay the loan, the matter was resolved by the parties treating the loan as a redemption on Investor A's investment in the fund. Id. ¶ 94.

In May 2012, an investor labeled Investor B sued FMC on behalf of a trust for which he was the trustee. Id. ¶ 95. FMC settled the lawsuit by providing Investor B a $725,000 redemption in Investor B's interest in the fund. Id.

When another investor, Family Limited Partnership, requested a redemption in 2013, Defendants refused. Id. ¶ 96. Instead, T. Conrad arranged so that Family Partnership's redemption would be paid to a separate account that T. Conrad personally managed. Id. ¶ 97.

6. Summary of Claims

Based on these allegations, Plaintiff has brought ten counts against Defendants—six against T. Conrad, FMC, and SRL, and four against S. Conrad. As to T. Conrad, FMC, and SRL, Plaintiff asserts: (i) Fraud in violation of Section 17(a)(1) of the Securities Act; (ii) Fraud in violation of Sections 17(a)(2) and (3); (iii) Fraud in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder; (iv) Fraud in violation of Section 206(1) of the Investment Advisers Act; (v) Fraud in violation of Section 206(2); and (vi) Fraud in violation of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

As to S. Conrad, Plaintiff asserts: (i) Aiding and abetting fraud in violation of Section 17(a)(1) and (3); (ii) Aiding and abetting fraud in violation of Section 10(b) and Rule 10b-5; (iii) Aiding and abetting fraud in violation of Section 206(1) and (2); and (iv) Aiding and abetting fraud in violation of Section 206(4) and Rule 206(4)-8. Both S. Conrad and T. Conrad, with FMC and SRL, have moved to dismiss all of Plaintiff's claims.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this pleading standard does not require "detailed factual allegations," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S.662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "A complaint or counterclaim is viewed in the light most favorable to the plaintiff [or defendant], and all of the [defendant's] well-pleaded facts are accepted as true. Although a complaint or counterclaim need not contain detailed factual allegations, it must include enough facts to state 'a plausible claim for relief.'" United States v. Jallali, 478 F. App'x 578, 579 (11th Cir. 2012) (internal citation omitted) (quoting Iqbal, 556 U.S. at 679). A claim is plausible on its face when it provides the factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. Id. at 678.

To survive a motion to dismiss, a claim of fraud must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." However, "[m]alice, intent, knowledge, and other condition of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). Rule 9(b) may be satisfied if the pleading sets forth: (1) the precise statements, documents, misrepresentations, or omissions made; (2) the time, place, and person responsible for the statement or omission; (3) the content and manner in which these statements misled the plaintiff; and (4) what the defendant gained by the alleged fraud. Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997).

## III.   DISCUSSION

### a.  Claims against T. Conrad, FMC, and SRL

In their Motion to Dismiss, Defendants T. Conrad, FMC, and SRL argue that Plaintiff's claims should be dismissed for five reasons. They are: (1) Plaintiff fails to plead fraud with particularity as required by Twombly, Iqbal, and Rule 9(b); (2) Many of Plaintiff's allegations are barred by the five year statute of limitations; (3) Plaintiff fails to plead how Defendants' alleged misstatements and omissions were made in connection with the offer, purchase, or sale of securities; (4) Defendants were not the "maker" of the alleged misstatements and omissions; and (5) Defendants are not investment advisers to the Funds' investors.

The first two arguments relate to the Complaint more generally and will be discussed separately. The second and third arguments relate specifically to the Securities Act and the Securities Exchange Act. The last argument relates only to the Investment Advisers Act.

Aside from those five arguments, Defendants make various arguments throughout their brief about the five allegedly fraudulent acts. The Court will also address them separately.

However, before assessing Defendants' arguments, the Court notes that, in its brief in response to Defendants' Motion to Dismiss, Plaintiff outlined which allegedly fraudulent activities violate which Act. Plaintiff takes facts as alleged in the Complaint and then provides a detailed explanation of how these facts fit within the individual claims. Specifically, Plaintiff asserts that Defendants' alleged misuse of fund assets to benefit family members and his alleged misuse of fund assets to purchase investments in his name violate the Investment Adviser Act, only, and therefore, must only comport with its requirements. Next, Plaintiff asserts that the alleged redemption scheme and scheme to pay T. Conrad extra compensation violate the Adviser Act, the Securities Act, and the Securities Exchange Act such that those alleged actions must comport with *each* Act's requirements. Lastly, Plaintiff asserts that the alleged failure to disclose T. Conrad's disciplinary history in the Funds' offering materials violates the Securities Act and the Securities Exchange Act such that the Plaintiff need only allege facts required under those Acts.

13

### i. General Arguments

#### 1. Failure to plead with particularity

Defendants argue that the way in which Plaintiff organized the Complaint constitutes a shotgun pleading. According to Defendants, Plaintiff failed to tie specific facts to the claims asserted in the Complaint. That is, in its Complaint, Plaintiff outlines the background information in numbered paragraphs and then lists its claims against Defendants separately. Then, in the list of claims, Plaintiff incorporates by reference the preceding paragraphs without specifying which facts demonstrate a violation of which Act.

Although the Court shares Defendants' frustration, the Court is unwilling to dismiss Plaintiff's Complaint based on this single alleged defect. While the Eleventh Circuit disfavors "form incorporation" in pleadings because such incorporation often results in shotgun pleadings, in this case, it is difficult but not "virtually impossible to know which allegations of fact are intended to support which claims for relief." Paylor v. Hartford Fire Ins. Co., 748 F.3d 1117, 1126 (11th Cir. 2014). As a general rule, a complaint only constitutes a shotgun pleading when it fails "to identify claims with sufficient clarity to enable the defendant to frame a responsive pleading." Beckwith v. Bellsouth Telecomms. Inc., 146 F. App'x 368, 371 (11th Cir. 2005).

Here, as evidenced by Defendants' thorough brief in support of their motion to dismiss, Plaintiff's Complaint appropriately enables a defendant to know which facts are intended to support which claims such that he or she may

file a responsive pleading. Therefore, Defendants' argument that Plaintiff's Complaint constitutes a shotgun pleading requiring dismissal is without merit.

Additionally, Defendants generally argue that, even if Plaintiff's Complaint does not constitute a shotgun pleading, it is still insufficient to state a claim for fraud under Rule 9(b). Specifically, Defendants contend that Plaintiff has failed to allege the "who, what, where, when, why" of each alleged fraudulent omission or misstatement with sufficient particularity.

Plaintiff counters that the Complaint alleges sufficient facts to put Defendants on notice of exactly what fraudulent omissions are at issue in this case, when they occurred, and how they were disseminated. The Court agrees. A look at the Complaint shows at least 20 paragraphs that provide approximate dates related to each alleged omission. See Dkt. No. [1] ¶¶ 41, 49, 50-52, 55, 61, 65-67, 71, 73, 78, 81-85, 93, 95. Additionally, in at least eight paragraphs, the Complaint references specific offering materials distributed to investors or conversations had with investors where Defendants allegedly omitted specific, necessary facts. Id. ¶¶ 43, 49-52, 55, 65, 71.

While some of the allegations do not provide *exact* dates, point to *exact* offering materials, or allege which *exact* investor received incomplete offering materials, "[r]ule 9(b) exists to prevent spurious charges and provide notice to defendants of their alleged misconduct, not to require plaintiffs to meet a summary judgment standard before proceeding to discovery." U.S. ex rel. Longest v. Dyncorp, No. 603CV16ORL31JGG, 2006 WL 47791, at *5 (M.D. Ga.

Jan. 9, 2006). As stated above, Plaintiff has provided enough information—albeit in a format confusing at times. Defendants clearly have notice of the alleged omissions and/or misrepresentations, when they occurred, and how they were disseminated. Any additional, necessary information may be revealed during discovery. For that reason, the Court will not dismiss Plaintiff's Complaint based on lack of specificity at this stage in the litigation.[2]

### 2.  Five year statute of limitations

Defendants next argue that Plaintiff's claims must fail because many of the allegations in the Complaint fall outside the five year statute of limitations. See 28 U.S.C. § 2462 ("[A]ny civil fine, penalty, or forfeiture . . . shall not be entertained unless commenced within five years from the date when the claim first accrued."). Plaintiff counters, however, that the five year statute of limitations only applies to its requests for disgorgement of ill-gotten funds and civil penalties. Plaintiff argues that the statute of limitations does *not* apply to its request for a permanent injunction enjoining Defendants from continuing violations of the Acts.

The Court agrees. The statute of limitations will only work to prevent disgorgement and civil penalties requested by Plaintiff for alleged fraudulent activity occurring outside the five year statute of limitations. Id. (only discussing

---

[2] Throughout the oral argument, Defendants argued that Plaintiff's allegations must be dismissed because many documents and policies were not attached to the Complaint. However, this argument is better suited for a motion for summary judgment. As such, the Court will not discuss it further.

the limitations period in terms of forfeiture and civil penalties). It will not, however, prevent the Court from enjoining Defendants, if necessary, based on alleged frauds outside the limitations period. Additionally, it will not prevent disgorgement and civil penalties based on alleged frauds *within* the limitations period.[3]

Related to this argument, at the hearing, Defendants argued that many of the allegations of fraud are implausibly alleged to have been committed by all three main Defendants. That is, Plaintiff makes allegations concerning certain omissions made by all three Defendants. However, many of those omissions are alleged to have occurred prior to 2014, when SRL was not yet a general partner/investment advisor to the funds. Because SRL could not have made those earlier omissions, Defendants contend those claims should be dismissed.

The Court agrees that three of the five omissions/fraudulent activities are alleged to have occurred before SRL was a general partner. They are: (1) Conrad's appointment as sub-manager in January 2013; (2) the loans made to family members using fund assets in February 2010 and July 2013; and (3) Conrad's use of fund assets to purchase investments in his name during an undefined "relevant

---

[3] The parties have not fully briefed this issue in terms of exactly when the limitations period started, which alleged omissions occurred outside the period, and therefore, from which omissions Plaintiff can and cannot receive disgorgement of funds. As the parties have not fully addressed the issue, the Court will not attempt to define which omissions are inside or outside the limitations period at this time.

time period." As such, the claims associated with these alleged omissions are **DISMISSED** as to SRL.

>    ii.   *Arguments related to the Securities Act and Exchange Act*

As discussed above, Plaintiff asserts that three of the five alleged frauds violate both the Securities Act and the Securities Exchange Act. They are: (1) the alleged redemption scheme, (2) the alleged scheme to pay T. Conrad extra compensation; and (3) the alleged failure to disclose T. Conrad's disciplinary history in the Funds' offering materials and the misleading information regarding historical performances and auditors.

To properly allege a violation of § 10(b) and Rule 10b-5 of the Securities Act, a claimant must allege: (1) a material misrepresentation or materially misleading omission; (2) that the material misrepresentation or omission was made in connection with the purchase or sale of securities; and (3) that the offender had scienter. S.E.C. v. Torchia, 1:15-CV-3904-WSD, 2016 WL 1650779, at *12 (N.D. Ga. April 25, 2016). Proof of a violation of § 17(a) of the Securities Exchange Act requires "essentially the same elements" as § 10(b) and Rule 10b-5, requiring proof that the actions were made in connection with the offer or sale of securities. Id.

>    1.   **In connection with the offer, purchase, or sale of securities**

Defendants first contend that Plaintiff has failed to allege how the three alleged acts involved the offer, purchase, or sale of securities, as required by the

Securities Act and the Securities Exchange Act. Therefore, the Court must determine if Plaintiff sufficiently alleged that the extra compensation paid to T. Conrad, Defendants' failure to include T. Conrad's disciplinary history in the offering materials, and the redemption practices involved the offer, purchase or sale of securities. The Court finds that they do.

As to the first two, the Court finds that "[w]here the fraud alleged involves public dissemination of a . . . document on which an investor would presumably rely, the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission." S.E.C. v. Trabulse, 526 F. Supp. 2d 1001, 1006 (N.D. Cal. 2007). That is, Plaintiff has alleged that the offering materials provided by Defendants to prospective investors, which were distributed in connection with the sale or purchase of securities, did not include material information regarding T. Conrad's disciplinary history or his ability to unilaterally draw more compensation. Additionally, Plaintiff alleges that the offering materials included incorrect or misleading information regarding performance history and auditors. In coming to this conclusion, Plaintiff relies on the Investor Fact Sheets, the various marketing materials, and the face-to-face and telephonic sales pitches made to prospective investors, which helped the investors decide whether to invest.[4]

---

[4] The Court will refer to the Investor Fact Sheets, the various marketing materials, and the face-to-face/telephonic conferences collectively as the "Offering Materials."

The Court understands Defendants' position that T. Conrad's unilateral appointment as sub-manager did not, by itself, involve a sale or purchase of securities. Additionally, the Court understands that T. Conrad being disciplined by the SEC does not, on its own, involve the purchase or sale of securities. However, it is when the Court considers the Offering Materials in conjunction with these alleged omissions that it finds the omissions relate to the purchase or sale of a security.

That is, Plaintiff has alleged it was Defendants' failure to include and disclose the information in the Offering Materials that violated § 17(a) and § 10(b), not the acts alone. See, e.g., Dkt. No. [1] ¶ 48 ("That conflict of interest should have been, but was not, disclosed to . . . prospective investors."). Because the Offering Materials undoubtedly relate to the sale or purchase of securities, a material and misleading omission in the Offering Materials also relates to the sale, offer of sale, or purchase of securities and violates § 17(a) and § 10(b).

As to the redemption scheme, the Court agrees with Plaintiff's argument that the allegedly fraudulent scheme was necessarily made in connection with the offer or purchase of securities. That is, the scheme became fraudulent when Defendants allowed some investors to redeem their investments (i.e. by selling their investments in the Funds for cash) while preventing others from doing the same. Simply imposing the ban is not what Plaintiff challenges. It is when Defendants allegedly allowed some, but not all, investors to redeem their

20

investments through the sale of securities that the ban potentially violated the
Securities Act and Securities Exchange Act.

> 2.   Making the alleged misstatements and omissions

Next, Defendants argue that, even if the omissions relate to the sale or
purchase of securities through the Offering Materials, Plaintiff has not alleged
that Defendants made the Offering Materials with the alleged omissions. Instead,
Defendants contend that Plaintiff alleged that WOF Master and the various
feeder funds made and distributed the Offering Materials. According to
Defendants, T. Conrad, FMC, and SRL were merely investment advisors that
cannot be held liable for their client's actions.

As support, Defendants rely on Janus Capital Group, Inc. v. First
Derivative Traders, 564 U.S. 135, 142 (2011). In that case, shareholders of an
asset management firm filed a putative class action against the firm and its
wholly-owned investment advisor subsidiary. Janus Capital, 564 U.S. at 137. The
plaintiffs alleged that the firm and its subsidiary defrauded investors in violation
of Rule 10b-5 through the firm's offering materials. Id. It was undisputed that the
firm issued the offering materials to investors. Id. at 138. Additionally, there were
no allegations that the subsidiary made the statements and falsely attributed
them to the firm. Id. at 147. As a result, the Supreme Court held that the
subsidiary could not be held liable for false statements made in its client's
offering materials because there was no evidence that it made the statements. Id.

Plaintiff contends that this case is distinguishable from Janus Capital because Plaintiff *has* alleged that Defendants made the statements. The Complaint states that, in the disclosure brochure for investors, "*Conrad* touted that FMC has been 'managing wealth since 1965.'" Dkt. No. [1] ¶ 50 (emphasis added). It goes on to allege that "Conrad, FMC, and [SRL] prepared and distributed these marketing materials to investors and prospective investors in connection with the offer and sale [of] interests in these funds." Id. ¶ 53. Additionally, Plaintiff points to the face-to-face and telephonic meetings in which the Complaint alleges "Conrad, FMC, and [SRL] described Conrad's experience as they were detailed in the above-mentioned offering memoranda and marketing materials." Id. ¶ 54.

The Court agrees with Plaintiff. The Supreme Court in Janus Capital dismissed the claims, in part, because the plaintiffs had not alleged that the investment advisor made the allegedly false statements. See Janus Capital, 564 U.S. at 147. It did not, as Defendants suggest, create a blanket rule that investment advisors are never liable for allegedly false statements made in connection with their clients' offering materials.

In fact, the Supreme Court ruled that, "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Id. at 142. Such a rule leads to the possibility that an investment advisor could be held

liable for an allegedly false statement if the advisor had the ultimate authority over the statement.

While Plaintiff did not explicitly allege that T. Conrad, FMC, and SRL had ultimate authority over the Funds' public statements, the Complaint does allege that T. Conrad controls the Funds through his control of FMC and SRL. Dkt. No. [1] at ¶ 36 ("Through FMC and [SRL], Conrad made all investment decisions for WOF, WOF Master, World Fund II, and BVI."). The Court can reasonably infer that T. Conrad, FMC, and SRL's alleged control over the Funds extends to controlling their public statements. See, e.g., Johnson Outdoors Inc. v. Navico, Inc., 774 F. Supp. 2d 1191, 1196 (M.D. Ala. 2011) (holding that a court may make reasonable inference under Rule 9(b) if the claimant has included sufficient allegations of underlying facts).

Therefore, not only has Plaintiff actually alleged that Defendants made the allegedly fraudulent omissions in the Offering Materials, it has also alleged sufficient facts to demonstrate that Defendants had ultimate authority over the Offering Materials. As such, Defendants' argument is not persuasive.

### iii.   Arguments Related to the Investment Advisers Act

As discussed above, Plaintiff contends that four of the five alleged actions implicate the Investment Advisers Act. They are: (1) the loans made to T. Conrad's family; (2) the investments purchased in T. Conrad's name; (3) the scheme to pay T. Conrad additional compensation and the attendant conflict of interest; and (4) the redemption scheme.

The Investment Advisers Act makes it unlawful for an investment adviser to employ any device, scheme, or artifice to defraud, or to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon "any client or prospective client." 15 U.S.C. § 80b-6. According to Defendants, Plaintiff has not alleged a violation under the Act because the alleged actions were not directed towards Defendants' clients or prospective clients.

More specifically, Defendants argue that the Funds are their clients and not the individual investors. According to Defendants, the Complaint alleges that the fraudulent activities were directed towards and harmed the investors, not the Funds. As such, Defendants contend that they cannot be held liable under the Act.

The Court agrees with part of Defendants' argument. That is, the Court finds Plaintiff *has* stated a claim under the Act with regard to the alleged fraudulent loans, the sub-manager position, and the investments made in T. Conrad's name. However, the Court agrees with Defendants that Plaintiff has not stated a claim under the Act for the alleged redemption practices.

A look at the Complaint shows that Plaintiff did not allege a single fact showing that the redemption practices created a fraud on the Funds. Instead, the Complaint discusses the redemption practices as only defrauding the investors, who, as Defendants contend, are not Defendants' clients. SEC v. Mannion, 789 F. Supp. 2d 1321, 1338-39 (N.D. Ga. 2011) ("[A] hedge fund's investors are not clients of the hedge fund adviser.").

Additionally, Plaintiff's brief fails to rebut this argument. Instead, it only discusses how the redemption practices defrauded investors. See, e.g., Dkt. No. [12] at 9-10 (". . . Defendants' scheme to grant redemptions to themselves and favored investors [] to the detriment of other investors."). As such, the Court finds that Plaintiff has not stated a claim under the Investment Advisers Act with regard to the redemption scheme. That theory and the attendant Investment Advisor Act claims against Defendants are **DISMISSED**.

However, as to the remaining three allegations, the Court finds that Plaintiff has alleged sufficient facts to demonstrate that, if true, Defendants committed a fraud on the Funds. For example, as to T. Conrad's position as sub-manager, the Complaint alleges that T. Conrad was able to unilaterally extract an additional one percent fee out of the Funds' assets. Dkt. No. [1]¶ 42. According to the Complaint, this constituted a conflict of interest between T. Conrad and the Funds as T. Conrad was supposed to represent the interests of the Funds but also had a personal interest in awarding the sub-manager business to himself, which he did. Id. ¶ 47.

As to the loans, Plaintiff alleges that T. Conrad "paid money from *the WOF Master account*" to his daughter-in-law as a loan to pay off credit card bills. Id. ¶ 63 (emphasis added). Additionally, the Complaint alleges that T. Conrad allowed his other son to write himself "a $26,500 check from *the WOF Master Account*" as a loan to buy a truck. Id. ¶ 66 (emphasis added).

Lastly, the Complaint alleges that T. Conrad used investor money, invested in the Funds, to purchase investments in his name rather than in the name of WOF Master. Id. ¶¶ 68-69. While Defendants excuse this behavior by claiming T. Conrad was only holding on to the investments for a time, the Court must look to the Complaint and the Complaint does not make such an allegation. Instead, the Complaint suggests that T. Conrad took money from the WOF Master account and bought himself investments. These allegations and the allegations described above sufficiently allege that Defendants committed fraud upon their clients, the Funds.

Defendants also argue that Plaintiff has failed to state a claim under this Act because it has failed to allege either an omission or a scheme to defraud. However, as the Court has discussed in detail, Plaintiff has alleged at least three frauds/omissions that fall under the scope of the Act. While Defendants contend that the allegations of each fraud are too conclusory, the Court has already discussed why the allegations are sufficient to state a plausible claim under Rule 9(b).

### iv.  Specific Omissions

As discussed above, aside from the five arguments specifically outlined in their brief, Defendants also make various arguments about the individual alleged omissions. The Court will discuss each argument in turn.

### 1.  Sub-manager omission

Defendants contend that Plaintiff has not alleged why Defendants' failure to disclose T. Conrad's appointment as sub-manager was misleading. However, the Court disagrees. Plaintiff alleges that the Offering Materials laid out the payment structure wherein FMC would receive between 1.8% and 2.4% of WOF Master's total assets. Plaintiff also alleges that the Offering Materials laid out incentive payments if WOF Master hit certain benchmarks. Plaintiff then alleges that T. Conrad withdrew extra compensation after he appointed himself sub-manager without including that information in the Offering Materials or disclosing beforehand that he could unilaterally take that position. While Plaintiff does not explicitly allege that the omission of the extra compensation was misleading because the Offering Materials disclosed other fees, the Court can reasonably infer that an investor could be mislead by the Offering Materials when the Offering Materials include some fees but not all fees and fail to acknowledge that T. Conrad could unilaterally appoint himself to the position for additional compensation.[5] See Navico, Inc., 774 F. Supp. 2d at 1196.

---

[5] Importantly, while Defendants argued that this one omission is not misleading, they have not argued that for purposes of this motion that any of the omissions are immaterial. That is, Defendants appear to concede that the omissions, if actually misleading and actually related to the sale or purchase of securities, are material.

Nonetheless, even if Defendants had argued that any of the omissions were immaterial, the Court finds, at this stage in the litigation, that they are material. An omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding" whether to invest. Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988). Here, the Court finds that for

Defendants further argue that Plaintiff has not attached or identified any informational documents given to prospective investors subsequent to T. Conrad's appointment as sub-manager that fail to include this information. However, at the motion to dismiss stage, Plaintiff is not required to attach supporting documents or evidence. Additionally, as Plaintiff has alleged that T. Conrad had this unilateral power to appoint himself sub-manager from the start of the Funds, the omission was not in any one informational document. Dkt. No. [1] ¶ 47. Instead, it was in each informational document provided to investors.

Related to that argument, Defendants contend that Plaintiff has not included any allegations about other sub-manager's compensation, which Defendants argue is twice that of T. Conrad's sub-manager compensation. Nonetheless, the issue is not whether T. Conrad was being paid more or less than the other sub-managers. The issue is whether Defendants' failure to disclose that T. Conrad allegedly had unilateral power to appoint himself to a position that allowed him to draw more compensation than what was disclosed in the Offering Materials violates securities laws.

---

purposes of ruling on these Motions, a reasonable investor would consider it important to know if T. Conrad had ever been disciplined by the SEC, which is evidenced by an investor actually asking T. Conrad about his so-called "skeletons." Additionally, the Court finds that a reasonable investor would want to know if T. Conrad could unilaterally decide he would take more compensation and withdraw assets for himself and his family members, even if the assets would be returned. As such, to the extent Defendants have argued that this information is immaterial, their argument does not persuade the Court.

2.  Loans and purchases using fund assets

Defendants contend that Plaintiff has not alleged how investors were harmed by T. Conrad allegedly taking loans and buying assets in his own name using fund assets. However, Defendants have not cited any authority indicating that Plaintiff must allege harm to state a claim under the Investment Advisor Act. Additionally, the Court could not find any authority requiring Plaintiff to demonstrate harm. Instead, the Supreme Court simply imposes "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts." SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 194 (1963) (internal quotations omitted). As such, Defendants have not met their burden to dismiss claims related to these alleged omissions.

Defendants also argue that Plaintiff has not alleged when the loans were made and when the investments were bought in T. Conrad's name. However, the Complaint *does* allege that the two loans for his family members were made in February of 2010 and July of 2013. Dkt. No. [1] ¶¶ 65-66.

While Plaintiff generally states that the investments purchased in T. Conrad's name were made "[d]uring the relevant period," the Court finds that the allegations surrounding those investments are specific enough that Defendants could not be confused as to which investments the Complaint is referring to, even without reference to a specific date. For instance, the Complaint alleges that T. Conrad bought two soybean farms in Uruguay using fund assets. Id. ¶ 67. Next,

29

Plaintiff alleges that T. Conrad bought $88,000 in precious metals using fund assets. Id. ¶ 69. These allegations provide Defendants with sufficient information for them to discern exactly which alleged activities the Complaint is referencing.

### 3.  Disciplinary history

Next, Defendants focus on T. Conrad's alleged disciplinary history. Defendants contend that Plaintiff only attempts to connect the alleged omission with a sale or purchase of securities through the conversation T. Conrad had where he was asked about any skeletons in his closet. According to Defendants, this example fails to state a claim under § 17(a) and § 10(b) because Plaintiff has not alleged the name of the investor, the day or month this conversation took place, where the conversation took place, and in what context.

However, the conversation regarding T. Conrad's "skeletons" was not the only time T. Conrad allegedly omitted his disciplinary history, according to the Complaint. Instead, the Complaint also indicates that the written Offering Materials discussed his membership on the stock exchange, his management of investments back in the 1960's, and his brokerage firm, Conrad & Company. However, as alleged in the Complaint, those documents failed to disclose how he was suspended from the stock exchange, how the SEC investigated him in the 1970's, and how Conrad & Company's registration was revoked.

These omissions are potential omissions of material *fact*,[6] and the Complaint alleges dates in which the documents lacking these material facts were distributed. As such, the Court finds that, regarding the disciplinary history, Plaintiff has stated a claim under the Securities Act and Securities Exchange Act.

### 4.  Redemption Scheme

Defendants generally argue that Plaintiff has failed to allege that Defendants actually made false statements/omissions with regard to the alleged redemption scheme. That is, Defendants contend that Plaintiff failed to specifically allege in the Complaint that the 2008 statement temporarily suspending redemptions was false in light of the redemption payments allegedly made in 2010 and beyond.

However, as discussed above, the Complaint alleges sufficient facts to allow the Court to infer that the statements were false in light of the redemptions paid. That is, Plaintiff has alleged that Defendants told investors that *no investor* could redeem its investment. It then alleges that Defendants allowed a select few investors, including T. Conrad's family members, to redeem investments while prohibiting other investors from redeeming. It follows that stating no investor can redeem and then allowing some investors to redeem makes the former statement false.

---

[6] In their brief, Defendants also challenge the fact that T. Conrad's representation that he lacked "skeletons" was a representation of opinion rather than fact. However, because the Complaint also alleges that Defendants omitted actual facts while including other facts that made the omissions material, the Court need not discuss whether the "skeleton" representation constitutes a fact.

Defendants then argue that the Court cannot reasonably infer that the 2008 ban on redemptions was still in effect in 2010 and beyond. However, the Complaint specifically alleges that the ban still applied to investors from between 2009 and 2014. See Dkt. No. [1] ¶ 84 (discussing S. Conrad's redemptions from between 2009-2014); Id. ¶ 90 ("At the time of each redemptions[sic] . . ., Stuart Conrad knew that his receipt of funds was a deviation from the policy . . . which purportedly applied to all investors."). At this stage, the Court is required to take all alleged facts as true. Additionally, it is not totally unreasonable, as Defendants urge, to infer that the ban on redemptions lasted for several years—particularly if the Funds were trying to recover from the 2008 downturn.

Lastly, Defendants contend that the Complaint fails to allege any specific redemption request that was made and rejected at the same time T. Conrad's family members received redemptions. Defendants are correct that Plaintiff has only generally alleged that, by 2013, 29 investors asked for and were denied redemptions when other investors received redemptions. Although this claim could certainly contain more detail, it is not so vague as to prevent Defendants from understanding its nature. As such, the Court finds that Plaintiff has adequately alleged a violation of the Securities Act and Securities Exchange Act with regard to the redemption practices.

Based on the above, only some of Plaintiff's original claims against T. Conrad, FMC, and SRL remain. As against T. Conrad and FMC: (1) Investment Advisor Act claims, Securities Act claims, and Securities Exchange Act claims for

the alleged failure to disclose T. Conrad's sub-manager conflict of interest; (2) Securities Act and Securities Exchange Act claims for the alleged failure to disclose T. Conrad's disciplinary history/the inclusion of misleading information and the alleged redemption scheme; and (3) Investment Advisor Act claims for the alleged loans to family members and investments made in T. Conrad's name. As against SRL, the only remaining claims are Securities Act and Securities Exchange Act claims for failure to disclose T. Conrad's disciplinary history/inclusion of misleading information and the alleged redemption scheme. All other claims are **DISMISSED**.

### b.  Claims against S. Conrad

As discussed above, Plaintiff has brought four claims against S. Conrad. They are: (i) Aiding and abetting fraud in violation of Section 17(a)(1) and (3); (ii) Aiding and abetting fraud in violation of Section 10(b) and Rule 10b-5; (iii) Aiding and abetting fraud in violation of Section 206(1) and (2); and (iv) Aiding and abetting fraud in violation of Section 206(4) and Rule 206(4)-8.

To state a claim for aiding and abetting a violation of the securities or investment adviser laws, a plaintiff must prove: (1) a primary violation has occurred; (2) awareness by the aider that his role was part of an overall activity that was improper; and (3) that the aider knowingly and substantially assisted in the violation. Woodward v. Metro Bank of Dallas, 522 F.2d 84, 94 (5th Cir. 1975)

(quoting <u>SEC v. Coffey</u>, 493 F.2d 1304, 1316 (6th Cir. 1974)).[7] While it was not completely clear from the Complaint, Plaintiff has clarified in its brief that the only primary violations used against S. Conrad are the Investment Advisor Act, Securities Act, and Securities Exchange Act claims related to the redemption scheme.[8]

However, the Court has already dismissed the Investment Advisor Act claims against T. Conrad, FMC, and SRL as they relate to the redemption scheme. As such, there is no primary violation under that particular theory. As such, the aiding and abetting claim brought against S. Conrad related to the redemption scheme under the Investment Advisor Act is **DISMISSED**. Nonetheless, the redemption scheme theory under the Securities Act and Securities Exchange Act remain for now.

First, Defendants contend that Plaintiff has failed to state a plausible claim under the Securities Act and Securities Exchange Act for the underlying primary violations. However, the Court has already discussed why the alleged redemption scheme has been adequately pled as to those two Acts.[9]

---

[7] The Eleventh Circuit has adopted all Fifth Circuit decisions made prior to September 30, 1981. <u>Bonner v. City of Prichard, Ala.</u>, 661 F.2d 1206, 1207 (11th Cir. 1981).

[8] To the extent Plaintiff sought to hold S. Conrad liable under the other theories of alleged fraud, Plaintiff has failed to actually articulate why those claims survive. As such, the Court finds that those claims have been abandoned.

[9] Defendants spend much of their initial brief and reply brief arguing this point. However, the Court will not address these individual arguments as they have already been addressed.

Next, Defendants contend that the Complaint fails to adequately allege that S. Conrad substantially assisted in the violation. "The element of substantial assistance is met when, based upon all the circumstances surrounding the conduct in question, a defendant's actions are a 'substantial causal factor' in bringing about the primary violation." SEC v. K.W. Brown & Co., 555 F. Supp. 2d 1275, 1307 (S.D. Fla. 2007) (quoting Woods v. Barnet Bank of Ft. Lauderdale, 765 F.2d 1004, 1013 (11th Cir. 1985)).

Defendants first argue that, even though he is alleged to have been a partner in FMC and SRL, the Complaint fails to allege how that role helped him substantially assist in the alleged fraudulent scheme. Additionally, Defendants argue that the Complaint clearly alleges that T. Conrad made all the decisions regarding disbursement and redemptions. Those two factors, according to Defendants, are fatal to Plaintiff's claims against S. Conrad.

Plaintiff counters that the Complaint alleges, in detail, how S. Conrad sought redemptions for himself and his company several times when he knew that other investors were told they could not redeem their investments. As support, Plaintiff cites SEC v. Apuzzo, 689 F.3d 204, 206 (2d Cir. 2012). In that case, the Second circuit found that the element of substantial assistance could be met if the defendant "in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his actions to make it succeed." Apuzzo, 689 F.3d at 206 (quoting

U.S. v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938)). Plaintiff contends that the Complaint shows S. Conrad engaged in such activity.

Defendants argue that the allegations in the Complaint merely show that S. Conrad sought and received his own money. The Court agrees. There are no allegations that S. Conrad had any control over whether the primary Defendants would inequitably enforce the redemption scheme. And while Plaintiff alleges he was a director in FMC and SRL, there are still no allegations that this role provided him any control or authority over these decisions.[10] As such, Defendants' Motion to Dismiss the Securities Act and Securities Exchange Act claims against S. Conrad related to the redemption scheme is **GRANTED**.

## IV.   CONCLUSION

In accordance with the foregoing, the Court **DENIES in part** and **GRANTS in part** Defendants' Motions to Dismiss [8] and **GRANTS** Defendants' second Motion to Dismiss [9]. All claims against S. Conrad are **DISMISSED**.

**IT IS SO ORDERED** this 22nd day of February, 2017

LEIGH MARTIN MAY
UNITED STATES DISTRICT JUDGE

---

[10] Additionally, the Court notes that, while the Second Circuit may only require "some sort" of association with the alleged scheme, the Eleventh Circuit requires the abettor to be a "substantial causal factor." Compare Apuzzo, 689 F.3d at 206 with Woods, 765 F.2d at 1013.