IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| | : | 1:16-CV-2572-LMM |
| v. | : | |
| | : | |
| THOMAS CONRAD, FINANCIAL MANAGEMENT CORPORATION, and FINANCIAL MANAGEMENT CORPORATION, S.R.L., | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

## ORDER

This case is before the Court on Plaintiff's Partial Motion for Summary Judgment [64] and Defendants' Motion for Summary Judgment [68]. After due consideration, the Court enters the following Order.

## I.   BACKGROUND

The Court provided a detailed general background on the facts of this case in its Order on Defendants' Motions to Dismiss, which is incorporated by reference as though fully set forth herein. Dkt. No. [22] at 2-4. Pertinent to this Order, this matter arises from the allegedly fraudulent operation of a $10.7 million "fund of funds" operated by Defendant Thomas Conrad ("Conrad" or "Dr. Conrad"). Dkt. No. [1] ¶ 1. Conrad is the owner and controlling officer of Defendants Financial Management Corporation ("FMC") and Financial

Management Corporation, S.R.L. ("SRL"). Id. ¶ 9.

Plaintiff Securities and Exchange Commission ("the SEC") brought this action on July 15, 2016, charging six separate counts of fraud against Defendants and four counts of aiding and abetting fraud against former Defendant Stuart Conrad pursuant to various provisions of the Securities Act, the Securities Exchange Act, and the Investment Advisers Act. Id. The Complaint alleges that Defendant Conrad controls Defendant entities FMC and SRL, and together these Defendants fraudulently sold and redeemed interests in hedge funds they operate, including World Opportunity Fund, L.P. ("WOF")[1], World Opportunity Master Fund, L.P. ("WOF Master"), World Fund II, L.P. ("World Fund II") and World Opportunity Fund (BVI) Ltd. ("BVI") (collectively, "the funds"). Id. ¶ 1. WOF, World Fund II, and BVI are the feeder funds into WOF Master, although only WOF and World Fund II are currently active feeder funds since all BVI investors were moved into WOF. Dkt. No. [67] ¶ 21. In a master-feeder structure, investors buy limited partnership interests in a feeder fund, and the feeder funds in turn invest their assets in the master fund. Dkt. Nos. [64-2] ¶ 11; [67] ¶ 11. The SEC seeks civil penalties in addition to permanent injunctive relief. Dkt. No. [1] at 33-34.

The Court dismissed all counts against Stuart Conrad on February 22,

---

[1] WOF was previously named GEA and CCP. Dkt. No. [67] ¶ 26. For the sake of clarity, the Court will refer to the relevant fund only as "WOF" even when discussing facts from a time when it had a different name.

2017, leaving only fraud Counts I, II, IV, VI, VII, and IX against Defendants Conrad, FMC, and SRL. Dkt. Nos. [1, 22]. Further, the Court partially dismissed certain counts insofar as they relied on allegedly fraudulent activities that either could not meet the elements of those counts or could not be attributed to Defendant SRL because they predated SRL's existence. Dkt. No. [22] at 17-18, 23-25.

As to all Defendants, Count I alleges violations of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1); Count II alleges violations of Sections 17(a)(2) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(2), (3); Count IV alleges violations of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(2)(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; Count VI alleges violations of Section 206(1) of the Investment Advisers Act, 15 U.S.C. § 80b-6(1); Count VII alleges violations of Section 206(2) of the Investment Advisers Act, 15 U.S.C. § 80b-6(2); and Count IX alleges violations of Sections 206(4) and 206(4)-8 of the Investment Advisers Act, 17 C.F.R. § 275.206(4)-8.

All remaining counts are based on five categories of allegedly fraudulent activities underlying the counts in different configurations, and they are extant against all Defendants except where otherwise noted below. Dkt. No. [1]. These categories include: (1) failure to disclose a potential conflict of interest and

related compensation (Counts I, II, IV, VI, VII, and IX)[2]; (2) failure to disclose

disciplinary history (Counts I, II, IV, and IX); (3) failure to disclose loans to

family members (Counts VI, VII, and IX)[3] (4) fraudulent purchases (Counts VI,

VII, and IX)[4]; and (5) fraudulent redemption practices (Counts I, II, IV, and IX).

Each of these five categories, in turn, encompasses multiple separate acts.

First, the "failure to disclose conflicts and compensation" category includes

allegations of Conrad's nondisclosure of his appointment as sub-manager of WOF

Master in January 2013, nondisclosure of his compensation arrangement in that

role, and nondisclosure of the fact that he had unilateral authority to appoint

himself to the position. See Dkt. No. [1] ¶¶ 41-48. Plaintiff contends these are

material conflicts of interest requiring disclosure. Id.

Second, the "failure to disclose disciplinary history" category encompasses

allegations regarding World Fund II offering memoranda from January 2011 and

January 2013, a World Fund II disclosure brochure from January 2012, WOF

Master marketing materials from 2014, World Fund II investor fact sheets

distributed between December 2011 and January 2014, and various face-to-face

---

[2] All claims against Defendant SRL arising from the nondisclosure of Defendant Conrad's self-appointment as sub-manager of WOF Master and taking of additional compensation were dismissed. Dkt. No. [22] at 17-18.

[3] All claims against Defendant SRL arising from the nondisclosure of loans to family members were dismissed. Dkt. No. [22] at 17-18.

[4] All claims against Defendant SRL arising from the alleged fraudulent purchases were dismissed. Dkt. No. [22] at 17-18.

and telephonic pitches to prospective investors. Id. ¶¶ 49-58. Plaintiff alleges it was fraudulent for Defendants to tout Conrad's wealth management experience and career accomplishments going back to 1965 in these documents and conversations, while omitting a 1971 SEC opinion against Defendant Conrad barring him from associating with any securities broker or dealer.[5] This category also encompasses allegations that Defendants included certain false and misleading information in investor fact sheets regarding the historical performance of fund investments and whether the funds were audited. Id. ¶¶ 59-62.

Third, the "failure to disclose loans to family members" category includes an alleged February 2010 loan to Conrad's daughter-in-law and a July 2013 loan to Conrad's son from WOF Master fund assets. Id. ¶¶ 63-66.

Fourth, the "fraudulent purchases" category includes Defendant Conrad's alleged purchases in his own name, using fund assets, of two soybean farms in Uruguay and $88,000 worth of precious metals, neither of which was disclosed to investors. Id. ¶¶ 67-70.

Fifth, the "fraudulent redemption practices" category encompasses several

---

[5] See In the Matter of Thomas D. Conrad, Jr. Margaret J. Conrad Roland L. Gonzales, Jr. Conrad & Co., Inc., File No. 3-2338, 44 S.E.C. 725, 1971 WL 120507 (Dec. 14, 1971). Defendant Conrad was the president of registered broker-dealer Conrad & Company, Inc. The Commission's decision was based on findings that Conrad willfully aided and abetted certain willful violations of securities laws committed by an assistant branch manager of Conrad & Company, Inc. and attributed to the broker-dealer itself. See id., at *1-*5.

acts between 2008 and 2013 forming part of an alleged scheme to allow redemptions and withdrawals of asset funds by friends, family members, and favored investors, while denying the redemption requests of at least 29 other investors and justifying the denials by misrepresenting that all redemptions had been suspended. Id. ¶¶ 71-97.

Plaintiff has moved for summary judgment on the following claims against the following Defendants, based on the specified underlying categories:

(1)   Counts I,[6] II,[7] and IV[8]

(a) nondisclosure of conflicts and compensation (Defendants Conrad and FMC only)

(b) nondisclosure of disciplinary history (all Defendants), and

(c) fraudulent redemption practices (all Defendants);

(2)   Counts VI,[9] VII,[10] and IX[11]

(a) nondisclosure of conflicts and compensation (Defendants Conrad and FMC only)

---

[6] Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

[7] Section 17(a)(2) and (3) of Securities Act, 15 U.S.C. § 77q(a)(2), (3).

[8] Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(2)(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

[9] Section 206(1) of the Investment Advisers Act, 15 U.S.C. § 80b-6(1).

[10] Section 206(2) of the Investment Advisers Act, 15 U.S.C. § 80b-6(2).

[11] Sections 206(4) and 206(4)-8 of the Investment Advisers Act, 17 C.F.R. § 275.206(4)-8.

(b) nondisclosure of loans to family members (Defendants Conrad and

FMC only), and

(c) fraudulent redemption practices (all Defendants).

Dkt. No. [64]. The "fraudulent purchases" category is the only category of allegations not subject to Plaintiff's summary judgment motion. See id.[12] In the event the Court concludes that summary judgment is not warranted on any given count, Plaintiff asks the Court to grant partial summary judgment on specific elements of that count if the Court concludes the record supports such a finding. Id. at 20 n.8 (citing SEC v. Norstra Energy, Inc., 202 F. Supp. 3d 391, 398-99 (S.D.N.Y. 2016)).

Defendants filed a cross-motion for summary judgment on all counts. Dkt. No. [68].

## II.   LEGAL STANDARDS

Federal Rule of Civil Procedure 56 provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the

---

[12] Plaintiff also did not move for summary judgment on Count IX as it relates to the nondisclosure of disciplinary history category. See Dkt. No. [64-1] at 22-25.

applicable substantive law which might affect the outcome of the case." <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." <u>Celotex Corp.</u>, 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. <u>Johnson v. Clifton</u>, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. <u>Id.</u> (citations omitted). All reasonable doubts, however, are resolved in the favor of the non-movant. <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993).

The same standard of review applies to cross-motions for summary judgment, but the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts. S. Pilot Ins. Co. v. CECS, Inc., 52 F. Supp. 3d 1240, 1242-43 (N.D. Ga. 2014) (citing Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005)). Each motion must be considered "on its own merits, [with] all reasonable inferences [resolved] against the party whose motion is under consideration." Id. at 1243.

## III.  DISCUSSION

In order to more closely track the parties' briefing and to avoid unnecessary repetition, the Court will evaluate each category of alleged fraudulent conduct rather than discussing the counts in turn. For each conduct category, the Court will review all related counts to determine whether either party is entitled to summary judgment on any count for that particular category. Further, the Court will determine whether Plaintiff is entitled to partial summary judgment on any elements of any count, even if not entitled to summary judgment on the count as a whole. See Fed. R. Civ. P. 56(a).

### A. **Nondisclosure of Disciplinary History and Statements Regarding Historical Performance and Auditing**
### *Counts I, II, IV, IX against Defendants Conrad and FMC*

Count I of the Complaint arises under Section 17(a)(1) of the Securities Act, making it unlawful to use interstate commerce or the mails in connection with the offer or sale of securities "to employ any device, scheme or artifice to defraud." 15 U.S.C. § 77q(a)(1). To show a violation of 17(a)(1), Plaintiff must

prove "(1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with scienter." <u>SEC v. Merch. Capital, LLC</u>, 483 F.3d 747, 766 (11th Cir. 2007). Count II of the Complaint arises under Sections 17(a)(2) and (3) of the Securities Act, the former of which makes it unlawful to use interstate commerce or the mails in the offer or sale of any securities "to obtain money or property by means of . . . any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading[.]" 15 U.S.C. § 77q(a)(2). Section 17(a)(3) prohibits such use of interstate commerce or the mails "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(3). To show a violation of either of these sections under Count II, Plaintiff must also prove Defendants made material misrepresentations or materially misleading omissions in the offer or sale of securities, but scienter is not required. Count II can be met with a showing of negligence only. <u>Merch. Capital</u>, 483 F.3d at 766.

Count IV of the Complaint arises under Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder. Like Count I, Count IV requires a showing of scienter. The three subparts of Rule 10b-5 closely track the language of the three methods of mail fraud set forth in Section 17(a) of the Securities Act. For instance, like Section 17(a)(2) of the Securities Act, "Rule 10b−5[(b)] prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading.'" <u>FindWhat Inv'r Grp. v. FindWhat.com</u>, 658 F.3d 1282, 1305 (11th Cir. 2011) (quoting 17 C.F.R. § 240.10b–5(b)).

Notably, Rule 10b-5 "is not read literally. Instead, a defendant's omission to state a material fact is proscribed only when the defendant has a duty to disclose." <u>Rudolph v. Arthur Andersen & Co.</u>, 800 F.2d 1040, 1043 (11th Cir. 1986). "By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not so incomplete as to mislead." <u>FindWhat Inv'r Grp.</u>, 658 F.3d at 1305 (internal quotations and citation omitted). A statement is misleading if "in the light of the facts existing at the time of the [statement] . . . [a] reasonable investor, in exercise of due care, would have been misled by it." <u>Id.</u> (citing <u>SEC v. Tex. Gulf Sulphur Co.</u>, 401 F.2d 833, 863 (2d Cir. 1968)).

### i.   *Disciplinary History*

Defendants admit they did not disclose the prior SEC enforcement action against Defendant Conrad. Dkt. No. [68-1] at 18. However, Defendants argue the omission was not material. <u>Id.</u> at 18-23. A misrepresentation or omission is material under if "a reasonable [investor] would attach importance to the fact misrepresented or omitted" in making an investment decision. <u>SEC v. Goble</u>, 682 F.3d 934, 943 (11th Cir. 2012) (quotations and citations omitted). There must be a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of

information made available." Id. at 944 n.5 (quotations and citations omitted). "[T]he relevant 'mix' of information is those facts an investor would consider when making an investment decision." Id.

The materiality requirement does not set an especially high bar, as its role in the analysis is "to filter out *essentially useless* information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision." Basic Inc. v. Levinson, 485 U.S. 224, 234 (1988) (emphasis added). Nonetheless, the materiality determination "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976). The materiality standard is thus an objective one, based on a hypothetical reasonable investor. See Amgen, Inc. v. Conn. Retirement Plans & Tr. Funds, 568 U.S. 455, 459 (2013); SEC v. Morgan Keegan & Co., Inc., 678 F.3d 1233, 1248 (11th Cir. 2012). See also United States v. Litvak, 889 F.3d 56, 68-69 (2d Cir. 2018) (finding the testimony of an individual investor whose perception was "confused" and "incorrect" irrelevant to the objective materiality determination). Therefore, for a court to resolve the issue of materiality "as a matter of law" by summary judgment, it must find "the established omissions . . . 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality[.]'" TSC Indus., Inc., 426 U.S. at 450 (quoting Johns Hopkins Univ. v. Hutton, 422 F.2d 1124, 1129 (4th Cir.

1970)). See also Lucas v. Fla. Power & Light Co., 765 F.2d 1039, 1040 (11th Cir. 1985) ("Mixed questions of law and fact, such as questions of materiality, scienter, and reliance, involve assessments peculiarly within the province of the trier of fact").

Defendants do not dispute any of the other elements of the counts arising from this category. Dkt. Nos. [68-1] at 18-23; [66] at 19-23. Therefore, the Court will address only the parties' arguments on materiality.

a. **Whether Defendants have established immateriality as a matter of law**

Defendants assert this nondisclosure is not material because (1) the 1971 enforcement action did not involve fraud and stemmed from a supervisory claim about the misconduct of Defendant Conrad's supervisee; (2) the age of the decision and Defendant Conrad's subsequent accomplished career diminish the weight of the decision overall; (3) the efficacy of the 1971 decision is questionable because the SEC's ALJ proceedings are not necessarily reliable; (4) the investor testimony on which Plaintiff relies to establish the materiality of the prior enforcement action is inadmissible as self-serving and speculative; and (5) a private litigant's fraud claim advanced on the same basis was dismissed on summary judgment by another judge in this Court and Plaintiff should not be permitted to maintain a similar claim on the same facts. Dkt. No. [68-1] at 18-23.

None of these proposed premises for finding the nondisclosure immaterial meets the summary judgment standard. First, a jury could find the nondisclosure

of Defendant Conrad's disciplinary history material notwithstanding the age of the decision, the substantive differences between the wrongdoing at issue in that case and the fraud alleged here, or the reliability of an SEC ALJ proceeding generally. The undisputed facts remain that the SEC prohibited Defendant Conrad from ever again associating with a registered broker-dealer and revoked the registration of Conrad & Company, the broker-dealer Defendant Conrad controlled. Also undisputed is that these substantive disciplinary measures resulted from a finding that Conrad "willfully violated the registration provisions of the Securities Act and willfully aided and abetted [Conrad & Company's] violations of certain provisions of the Exchange Act and rules thereunder[.]" In the Matter of Thomas D. Conrad, Jr., et al., 1971 WL 120507, at *2. See also id. at *4 (explaining in greater detail the finding that Conrad willfully violated and willfully aided and abetted his broker-dealer's violations of securities laws).

Moreover, the 1971 opinion casts aspersions on Defendant Conrad's character for truthfulness and fitness to engage in the securities business generally. See id. at *5 ("The record amply demonstrates not only Conrad's unfitness for assuming any proprietary or supervisory role with a broker-dealer, but for engaging in the securities business in any capacity. The numerous violations and the supervisory failures found with respect to him are compounded by the lack of candor he displayed in these proceedings."). These findings could certainly be important or even determinative to an investor's

14

decision whether to invest in funds controlled and operated by Defendant Conrad.

Second, the Court must also firmly reject Defendants' argument that the decision in <u>Savage v. Conrad</u>, Case No. 1:14-cv-04103-ODE (N.D. Ga. Jan. 9, 2017), forecloses a finding of materiality here. That opinion turned entirely on the "reasonable reliance" element of a private litigant's fraud claim. Specifically, the Court granted summary judgment to Defendant Conrad because the plaintiff failed to show that he reasonably relied on Defendant Conrad's omission of the 1971 enforcement action in deciding whether to invest, given that an investor exercising due diligence would have discovered the disciplinary history on his own. The Court gave no other reason why summary judgment was warranted on the fraud claim related to that nondisclosure. But reasonable reliance "is not an element of an SEC enforcement action because Congress designated the SEC as the primary enforcer of the securities laws, and a private plaintiff's 'reliance' does not bear on the determination of whether the securities laws were violated, only whether that private plaintiff may recover damages." <u>Morgan Keegan & Co.</u>, 678 F.3d at 1244. Defendants' assertion that "[t]his issue . . . has been litigated and decided in the Northern District of Georgia" is thus unpersuasive. Not one of the elements of the claims brought by Plaintiff here was litigated or decided there.

Third, Plaintiff has presented deposition and affidavit evidence from investors in the funds who state they would not have invested in the funds had the disciplinary action been disclosed—i.e., that the nondisclosure was material

to their investment decision. Dkt. No. [64-1] at 21-22 (citing Gerzanics Decl. ¶ 10, Dkt. No. [64-9] at 181-82; Scheller Decl. ¶ 6, Dkt. No. [64-9] at 210; Turner Decl. ¶ 6, Dkt. No. [64-9] at 240; Leber Decl. ¶¶ 3-5, Dkt. No. [64-10] at 104-06; Clay Dep. 25:3-14, 26:5-12, Dkt. No. [64-3] at 174-75; Burdeau Decl. ¶ 8, Dkt. No. [64-10] at 152). As noted above, Defendants contend that this testimony is inadmissible as self-serving and speculative. Even assuming for the sake of argument that Defendants are correct,[13] the content of the disciplinary opinion alone is sufficient for a jury to find the element of materiality met on the basis that any reasonable investor would have found the nondisclosure material to her decision to invest. Thus, Defendants' Motion for Summary Judgment is **DENIED** on these counts.

In response to Plaintiff's argument that materiality has been established, however, the Court finds the nondisclosure of Defendant Conrad's disciplinary history was material as a matter of law because Defendants had a duty to disclose it. It is undisputed that in written and oral pitches, prospectuses, and offering memoranda to investors in WOF, World Fund II, and BVI—all three feeder funds into WOF Master—Defendants FMC and Conrad touted Defendant Conrad's "seat on the Philadelphia-Baltimore-Washington Stock Exchange" and other wealth

---

[13] The Court need not and does not decide the admissibility of this testimony at this time. However, the Court notes that such testimony has been considered by other courts in determining materiality. See, e.g., Bell v. Cameron Meadows Lane Co., 669 F.2d 1278, 1282 (9th Cir. 1982).

management experience going back to 1965, while omitting that Defendant
Conrad was suspended by and expelled from that very same Stock Exchange in
connection with the disciplinary action by the SEC. Pl.'s Statement of Undisputed
Facts ("SEC UMF"), Dkt. No. [64-2] ¶¶ 40-41, 44-47, 50-55, 57-59, 61-65, 67-73,
75-77;[14] Dkt. No. [64-5] at 219-220. See also, e.g., Dkt. Nos. [64-6] at 2-3, 17, 24;
[64-8] at 45-46; [64-10] at 37-38, 186. "A duty to disclose may . . . be created by a
defendant's previous decision to speak voluntarily. Where a defendant's failure to
speak would render the defendant's *own* prior speech misleading or deceptive, a
duty to disclose arises." Rudolph, 800 F.2d at 1043.

As already noted, materiality is a question involving assessments
"peculiarly within the province of the trier of fact." Lucas, 765 F.2d at 1040.
However, in light of Defendants' repeated invocations of Defendant Conrad's
experience and Stock Exchange seat in their offering materials, the Court finds
that reasonable minds cannot differ on the question of the materiality of the
nondisclosure of Defendant Conrad's disciplinary history. See TSC Indus., Inc.,
426 U.S. at 450. Those statements were material because a General Partner's
wealth management experience and serious discipline from the regulating body
cannot be reasonably characterized as "essentially useless" information that a
reasonable investor would not consider significant. Levinson, 485 U.S. at 234.
There is a substantial likelihood that a reasonable investor would attach

---

[14] Defendants admitted to each of these facts in whole or in substance. See Dkt.
No. [67] ¶¶ 40-41, 44-47, 50-55, 57-59, 61-65, 67-73, 75-77.

importance to Dr. Conrad's experience, including his prestigious seat on the Stock Exchange, as part of the "total mix" of information considered in deciding whether to invest in the funds Dr. Conrad controlled. This is particularly true given that Dr. Conrad was the President, General Partner, and only person authorized to act on behalf of Defendant FMC, which in turn was the General Partner of WOF Master and World Fund II and the Manager of BVI. Conrad Decl., [68-2] ¶¶ 17. In other words, the statements regarding his wealth management experience and seat on the Stock Exchange were material. Goble, 682 F.3d at 943, 944 n.5. And by voluntarily using this information to persuade people to invest in the funds, Defendants created a duty to disclose Defendant Conrad's disciplinary history. Rudolph, 800 F.2d at 1043; FindWhat, 658 F.3d at 1305. See also Merch. Capital, 483 F.3d at 770-71 (finding the defendant's nondisclosure of his previous personal bankruptcy materially misleading where it "resulted from the failure of this business of which he was CEO, and which he touted in the offering materials as related and as relevant experience" in selling partnerships in his debt purchasing business). The omission of the related facts that Dr. Conrad was found to have willfully aided and abetted in an employee's fraud, barred from ever again associating with a registered broker-dealer, and ultimately expelled from the Stock Exchange in relation to the 1971 Order thus makes those statements touting Defendant Conrad's experience materially misleading as a matter of law.

Finally, it is not disputed that these statements were made using the means and instrumentalities of interstate commerce in connection with the purchase or sale of securities, and Defendants also do not refute that Plaintiff has established the scienter element of Counts I and IV or the negligence element of Count II. <u>See</u> Dkt. No. [67] ¶ 493; <u>see also</u> Dkt. Nos. [68-1] at 18-23; [66] at 19-23 (disputing only materiality). Additionally, the Court has conducted its own review of the record evidence on which Plaintiff relies to prove the remaining elements and finds that it has done so, even viewing the evidence in the light most favorable to Defendants. As such, Plaintiff is entitled to summary judgment on Counts I, II and IV insofar as those counts arise from this nondisclosure.

Plaintiff did not move for summary judgment on Count IX with respect to this nondisclosure. <u>See</u> Dkt. No. [64-1] at 22-25. As to all counts, Defendants sought summary judgment on the basis of the rejected argument that the nondisclosure was immaterial. Therefore, summary judgment as to Counts I, II and IV arising from Defendants' nondisclosure of Defendant Conrad's disciplinary history is **GRANTED** to Plaintiff and **DENIED** to Defendants. Further, Defendants' motion for summary judgment on Count IX as it relates to this nondisclosure is **DENIED.**

### ii. Statements Regarding Historical Performance and Auditors

As noted above, this category of fraud allegations also includes Plaintiff's claims that Defendants provided misleading information and false statements in investor fact sheets. Dkt. No. [1] ¶¶ 59-62. Plaintiff does not seek summary

judgment as to the counts arising from these allegations, but Defendants do. The relevant allegations include that certain investor fact sheets (1) described the positive performance history of soybean farm and precious metal investments from years before the funds acquired those investments, (2) provided World Fund II's weighted average performance in 2009 and 2010 although that fund did not exist until 2011, and (3) identified a third-party accountant who did not actually audit the financial statements of the funds as an "auditor." Id. ¶¶ 59-60.

Defendants argue they are entitled to summary judgment on the fraud claims arising from these allegations for several reasons. First, as to the auditor claims, they argue the third-party accountant in question, Earl W. Morrow, has confirmed under oath that he was hired to be an auditor for the funds and whether or not he completed an audit "is not germane to whether he [] himself is properly identified as an auditor." Dkt. No. [68-1] at 12-13. Moreover, Defendants contend that Dr. Conrad told the limited partners that "lesser levels of audit services" were being completed, and that the Limited Partnership Agreement ("LPA") indicates that the funds' books and records "shall be reviewed, compiled, and/or audited as of the end of each fiscal year by independent Certified Public Accountants selected by the General Partner." Id. at 13. Finally, while the LPA does require the General Partner to retain someone capable of performing audits, it does not require that the person so retained actually conduct an audit as opposed to a compilation or review. Id. at 13-14. Therefore, Defendants argue Plaintiff has failed to allege a fraudulent misrepresentation or omission based on

these facts.

As for the statements in investor fact sheets about the historical performance of certain fund investments, Defendants contend that all investor fact sheets "are clear on their face that they reflect the performance of the managers presently in the Funds, and a strained reading by Plaintiff and dissatisfied investors cannot turn that into the predicate for a fraud claim." Id. at 14 (citation omitted). Defendants also note that these documents have different titles in their different iterations, but that the titles clearly refer to the performance of fund managers. Id. Therefore, Defendants argue they should be granted summary judgment on fraud Counts I, II, IV, and IX arising from the auditor and historical performance allegations.

Although Plaintiff does not seek summary judgment on these allegations, Plaintiff challenges Defendants' arguments by listing specific representations to investors that the funds' financial statements would be or had been audited, even though it is undisputed that Mr. Morrow told Dr. Conrad in the fall of 2009 that he would not be able to complete a full audit. See Dkt. Nos. [73] at 8-9; [77] ¶ 37. Among other examples, Plaintiff points to offering memoranda for WOF from July 2010 and World Fund II from January 2011 identifying Mr. Morrow as the auditor and representing that "[e]ach partner receives annual audited financial statements." Dkt. No. [73] at 9 (citing to Dkt. Nos. [64-7] at 156; [64-9] at 97). See also, e.g., Dkt. Nos. [64-4] at 54, 56; [64-6] at 24, 26 (identifying Mr. Morrow as "Auditor" underneath the "Fund Structure" heading in investor fact sheets for

WOF Master); [75-4] at 91, 92 (February and March 2010 emails from Dr. Conrad to the limited partners stating that the WOF Master "December 31 Balance Sheet is currently being audited" and "[a] 12/31/2009 Balance Sheet Audit of [WOF Master] is estimated to be distributed by our newly contracted Auditors in May 2009 [sic].").[15]

Additionally, Plaintiff argues that several aspects of the fact sheets indicate they were "designed to create the appearance of a successful seven[-]year performance history." Dkt. No. [73] at 10. For instance, a July 2013 investor fact sheet for World Fund II included a section titled the "Current Portfolio 7-year Manager's History" purportedly summarizing the returns for various investments going back to 2007, although World Fund II did not exist in 2007 and the funds did not own some of the listed investments during that period. Moreover, Plaintiff asserts it is undisputed that the fact sheet did not list the funds' underperforming or unprofitable investments. Id. (citing Pl.'s Ex. 45, Dkt. No. [64-4] at 53, and D. Conrad Dep., Dkt. No. [61] at 64:1-24).

The Court finds that, viewing the evidence in the light most favorable to Plaintiff, there is sufficient record evidence to at least create a genuine issue of

---

[15] It is undisputed that WOF Master was indeed audited by Baker Tilly in 2014 for the fiscal year ended December 31, 2013. Dkt. No. [74] ¶ 78. Plaintiff's "auditor" fraud claims are confined to alleged misrepresentations made between 2010 and 2012 indicating the funds were being or had been audited even though only reviews and compilations were performed between 2009 and 2012. See id. ¶¶ 76-77.

material fact as to whether (1) Defendants misrepresented to investors that the funds were being audited when they were not; (2) Defendants misrepresented the historical past performance of the funds' investments to potential investors in offering memoranda; (3) these misrepresentations were material; and (4) these misrepresentations were made with scienter.[16]

### a. Defendants are not entitled to summary judgment on Plaintiff's claims related to the "auditor" representations.

Beginning with the auditor-related allegations, Defendants admit that Mr. Morrow told Dr. Conrad in the fall of 2009 that his firm could not perform an audit, and that Dr. Conrad understands the distinction between an audit, review, and compilation. Dkt. No. [77] ¶¶ 37, 39. It is also undisputed that Mr. Morrow's firm performed a review—not an audit—of WOF Master's financial statements for the fiscal year ending December 31, 2009. Id. ¶ 38. Yet Defendants admit Defendant Conrad sent emails to investors in February and March of 2010 indicating that the December 31, 2009 WOF Master balance sheet had been audited. Id. ¶¶ 41, 42. Moreover, identifying Mr. Morrow as an "Auditor" in investor fact sheets for WOF Master could mislead a reasonable investor into thinking the funds were subject to audits by Mr. Morrow. See FindWhat Inv'r Grp., 658 F.3d at 1305 (a statement is misleading if in light of the facts known at the time, a reasonable investor exercising due care would have been misled by it).

---

[16] It is not disputed that statements contained in the offering memoranda and investor fact sheets are made in connection with the purchase and sale of securities.

Defendants' position hinges on the fact that identifying Mr. Morrow as an "auditor" was not literally false, but it provides no answer to whether it was materially misleading. The same is true of the representations in the July 2010 and January 2011 offering memoranda that "[e]ach partner receives annual audited financial statements[,]" notwithstanding Defendants' position that the January 2013 LPA indicated such financial statements "shall be reviewed, compiled, *and/or* audited as of the end of each fiscal year . . . ." Dkt. Nos. [64-7] at 156; [64-9] at 97; [68-16] ¶ 79 (emphasis added). A reasonable juror could find these to be material misrepresentations made with scienter—that is, that Defendant Conrad must have known that making these statements presented a danger of misleading the partners into thinking that WOF Master had been audited when it had not. See SEC v. Carriba Air, Inc., 681 F.2d 1318, 1324 (11th Cir. 1982); SEC v. Southwest Coal & Energy Co., 624 F.2d 1312, 1321 n.17 (5th Cir. 1980).

> b.  Defendants are not entitled to summary judgment on the claims related to past performance representations.

Defendants are also not entitled to summary judgment on Plaintiff's fraud claims arising from statements in the investor fact sheets concerning past performance. Defendants admit they provided investor fact sheets to actual and prospective investors as part of their marketing materials. Dkt. No. [77] ¶ 47. The record contains World Fund II fact sheets dated December 2011, March 2013, and July 2013 including charts purporting to show the "Current Portfolio 7-Year

Manager's History." Dkt. No. [64-4] at 53, [64-6] at 23, 25. On both 2013 charts, the far-left column has a list of different entities under the header "Manager." Each entity in the list of "Managers" was a fund manager in World Fund II's current investment portfolio. The horizontal rows corresponding to each Manager date from 2007 to 2013, showing that manager's return for each year. The two columns at the far right of the chart purport to calculate the "Compounded Return" and "Annualized Return" for each manager. At the bottom of the chart on the far left, the chart provides four rows synthesizing the data from the chart entries above in different ways, including one row titled "World Fund II Weighted Average." While there is no data given for the "World Fund II Weighted Average" for 2007 or 2008, the boxes from 2009 to 2013 show a percentage for each of those years (e.g., 24% in 2009, 13.8% in 2010, -3% in 2011, and so on). Then, at the far right, the "World Fund II Weighted Average" shows a "Compounded Return" of 76% and an "Annualized Return" of 14.2% overall.

Defendants admit that World Fund II was not established until 2011. Dkt. No. [67] ¶ 16. Further, Defendants do not dispute that the funds did not own at least some of the listed investments during the seven-year period shown on the charts and that the charts omitted some of the funds' investments from that period. Dkt. No. [77] ¶ 49. Additionally, one point of dispute in this litigation is whether these charts appear to show the performance of specific fund investments rather than the performance of individual managers over the course

of those seven years. Viewing the facts in the light most favorable to Plaintiff, the Court finds a reasonable juror could find the charts materially and intentionally or recklessly misleading in this regard. For example, the 2013 charts list "FMC Managed Portfolio (Morgan Stanley)" as a "Manager." A jury could find that a reasonable investor would be misled by that notation into believing that the chart reflected the performance of World Fund II's *actual investments* in various funds and portfolios from 2007-2013, rather than the past performances of the fund's current managers only. Similarly, viewed in the light most favorable to Plaintiff, the facts could reasonably support a finding that the charts materially misrepresented the overall performance of the funds' investments by showing how the managers in the current portfolio had performed in years before they were in the World Fund II portfolio or before World Fund II even existed.

Accordingly, Defendants' motion for summary judgment as to Plaintiff's claims arising from the alleged "auditor" and historical performance misrepresentations is **DENIED.**

### B. <u>Nondisclosure of Conflicts and Compensation</u>
### *Counts I, II, IV, VI, VII, IX against Defendants Conrad and FMC*

Both parties seek summary judgment on the counts arising from this category.

#### i. *Applicable law on Counts I, II, & IV*

Counts I and II arise under Section 17(a) of the Securities Act, codified at 15 U.S.C. § 77q(a). Count IV arises under Section 10(b) of the Securities Exchange

Act and Rule 10b-5 thereunder, codified at 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, respectively.

To prevail on the Section 10(b) and 10b-5 claims set forth in Count IV, Plaintiff must show (1) a material misrepresentation or materially misleading omission, (2) made with scienter, (3) in connection with the purchase or sale of securities. Merch. Capital, 483 F.3d at 766. Counts I and II similarly require a showing of a material misrepresentation or materially misleading omission made in the offer or sale of securities. Id. Count I, arising under Section 17(a)(1) of the Securities Act, also requires a showing of scienter, but the 17(a)(2) and 17(a)(3) claims set forth in Count II require only negligence.

"Scienter may be established by a showing of knowing misconduct or severe recklessness." Carriba Air, 681 F.2d at 1324. Recklessness can be established by "a showing that the defendant's conduct was an extreme departure of the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id. (quoting Southwest Coal, 624 F.2d at 1321). "While scienter is an issue ordinarily left to a trier of fact, there are cases in which summary judgment may be appropriate." SEC v. Monterosso, 756 F.3d 1326, 1335 (11th Cir. 2014). Scienter can be established through either direct or circumstantial evidence. Id. (citing SEC v. Ginsburg, 362 F.3d 1292, 1298 (11th Cir. 2004)). For purposes of determining whether a corporate entity such as Defendant FMC acted with scienter, courts "look to the state of mind of the

individual corporate official or officials who make or issue the [fraudulent] statement (or order or approve it or its making or issuance . . .) rather than generally to the collective knowledge of all the corporation's officers and employees[.]" <u>Southland Sec. Corp. v. INSpire Ins. Sols., Inc.</u>, 365 F.3d 353, 366 (5th Cir. 2004). <u>See also</u> <u>McGee v. Sentinel Offender Servs., LLC</u>, 719 F.3d 1236, 1245 n.9 (11th Cir. 2013) (favorably quoting the same language from <u>Southland</u>).

*ii. Applicable law on Counts VI, VII, & IX*

Counts VI, VII, and IX all arise under Section 206 of the Investment Advisers Act, dealing with fraud committed by investment advisers by use of the mails or by any means or instrumentality of interstate commerce. 15 U.S.C. § 80b-6. Section 206 "establishes federal fiduciary standards to govern the conduct of investment advisers." <u>Transamerica Mortg. Advisors, Inc. v. Lewis</u>, 444 U.S. 11, 17 (1979) (internal quotations and citation omitted). Because an investment adviser acts as a fiduciary to clients, the adviser has "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading his clients." <u>SEC v. Capital Gains Research Bureau, Inc.</u>, 375 U.S. 180, 194 (1963) (internal quotations omitted). The Investment Advisers Act thus "reflects . . . a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline [an] investment adviser . . . to render advice which was not disinterested." <u>Id.</u> at 191-92.

28

Counts VI and VII arise, respectively, under Sections 206(1) and 206(2) of the Investment Advisers Act. Section 206(1) makes it unlawful to employ any device, scheme, or artifice to defraud, while 206(2) prohibits engaging in any transaction, practice, or course of business that operates as a fraud or deceit upon a client or prospective client. Section 206(1) requires proof of scienter, but 206(2) only requires showing of negligence. Steadman v. SEC, 603 F.2d 1126, 1134 (5th Cir. 1979). Because individual investors were not Defendants' "clients" within the meaning of this statute, these Counts apply only to Plaintiff's allegations that Defendants committed fraud on the funds, not on investors.[17] See Dkt. No. [22] at 24-25. Specifically, Counts VI and VII can be met with a showing that Defendant Conrad's self-appointment as sub-manager and extraction of an additional 1% fee from fund assets to pay himself for that position constituted a conflict of interest insofar as the appointment was not necessarily in the best interest of the funds. Id. at 25.

Count IX arises under Section 206(4) of the Investment Advisers Act, 15 U.S.C. § 80b-6(4), as well as Rule 206(4)-8 thereunder. 17 C.F.R. § 275.206(4)-8. These statutes prohibit advisers to pooled investment vehicles such as the funds from making false or misleading statements, omitting material facts, or otherwise

---

[17] Nonetheless, the materiality standard governing Section 206(1) fraud claims is the same as that applied to claims of fraud on individual investors—i.e., whether there is a substantial likelihood that a reasonable investor would consider the misrepresented or omitted fact important. See, e.g., ZPR Inv. Mgmt. Inc. v. SEC, 861 F.3d 1239, 1248-51 (11th Cir. 2017), cert. denied sub nom. ZPR Inv. Mgmt., Inc. v. SEC, 138 S. Ct. 756 (2018).

engaging in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with regard to investors or prospective investors. Thus, this Count applies to Plaintiff's allegation that this nondisclosure operated as a fraud on individual investors. Like Section 206(2), Section 206(4) does not require scienter and can be met with a showing of negligence only.

### iii. Parties' positions

Plaintiff asserts that Defendant Conrad, acting through Defendant FMC, committed violations of the Securities Exchange Act, Securities Act, and Investment Advisers Act by (1) failing to disclose that Defendant Conrad appointed himself a sub-manager of certain fund assets in January 2013, (2) failing to disclose that he had unilateral authority to appoint himself to that role, and (3) failing to disclose that he received a yearly fee of 1% of the assets under his management in connection with that role. Dkt. Nos. [1] ¶¶ 41-48; [64-1] at 17-18, 23-24. Specifically, Defendant Conrad appointed himself as sub-manager for approximately one-third of WOF Master's assets, including an account at Fidelity, precious metals, and WOF Master's investment in AIR, a company managed by Defendant Conrad's son. See Conrad Interview, Dkt. No. [65-3] at 10:21-13:7, 15:25-17:7, 20:6-9, 22:6-24:9, 28:22-29:12; see also Dkt. No. [67] ¶¶ 482-84.[18]

Plaintiff contends that the appointment and fee constitute conflicts of

_____

[18] Defendants objected to SEC UMF No. 482 on the basis that Defendant Conrad's statements in his unsworn interview transcript are inadmissible

interest that are presumptively material and should have been disclosed, and that Defendant Conrad and FMC's nondisclosure thus operated as a fraud on investors and the funds themselves. Dkt. No. [72] at 13-15. To establish the materiality of this nondisclosure, Plaintiff relies on record testimony from four investors indicating that these nondisclosures were material to their decisions to invest and that they would have considered Conrad's sub-manager role and accompanying fee a conflict of interest. Dkt. No. [64-1] at 24.

Defendants argue they are entitled to summary judgment on all counts arising from these alleged nondisclosures because Plaintiff has failed to establish any nondisclosure in the first instance or that any nondisclosure was material. First, Defendants assert that Conrad's role as a sub-manager was disclosed by identifying the assets he managed as "TDC managed assets"[19] in documents provided to investors. Dkt. No. [68-1] at 6, 17. Second, Defendants argue that the offering documents specifically disclosed to investors that sub-managers receive annual fees measured by a percentage of the value of the assets they manage. Id. at 4, 17. In support, Defendants rely on a January 2013 Offering Memorandum for World Fund II, which provides in pertinent part: "The sub-managers generally charge annual fees that are measured by a percentage of the value of the assets they manage." Conrad Decl., Ex. 1, [66-2] at 18. Third, beyond the offering

---

hearsay. Dkt. No. [67] ¶ 482. The Court overrules this objection because admissions by a party opponent are not hearsay. Fed. R. Ev. 801(d)(2).

[19] Defendant Conrad's initials are "TDC."

documents, Defendants also aver that a reasonable investor would assume that sub-managers were being paid in connection with that role and that Plaintiff conceded as much through its 30(b)(6) representative. Dkt. No. [68-1] at 6; see also Mashburn Dep., Dkt. No. [69-1] at 93:3-13, 96:18-22. Defendants contend these facts cannot establish a nondisclosure. Additionally, Defendants argue there is no record evidence that Defendant Conrad did not provide sub-manager services, charged higher rates than what another sub-manager would have charged, or that there was any loss to any investor, and that such evidence is necessary to show a conflict of interest to establish any nondisclosure as material. Dkt. No. [76] at 5-6.

Defendants do not dispute that they used the mails within the definition of Section 206. Thus, at issue here is whether Defendant Conrad's sub-manager position and related management fee were not disclosed—that is, whether there was any nondisclosure, misrepresentation, or fraudulent course of conduct in the first instance, and, if so, whether it was material.

a.  Whether there was a nondisclosure in the first instance

The Court finds there is a genuine issue of material fact as to whether Defendant Conrad's position as sub-manager and related fee were disclosed to investors. On the one hand, Plaintiff points to evidence showing that certain fund investments were listed as "TDC managed assets" even before Defendant Conrad began receiving a fee for his sub-manager position and argues that Defendants' disclosures of FMC and SRL's annual management fees as well as other conflicts

of interest gave rise to a duty to disclose the additional annual fee he received as sub-manager. See Dkt. Nos. [72] at 13-14, [73] at 15-16; see also Dkt. Nos. [67] ¶¶ 479-81 (Defendants admitting the offering memoranda and other partnership documents disclosed annual management fees and conflicts of interest); [75-6] at 4 (WOF Master Partners Portfolio document showing TDC Managed assets in November 2012). On the other hand, however, Defendants point to record evidence showing that it is an industry norm for sub-managers of hedge funds to take a fee measured by a percentage of the annual return of the funds they manage (commonly 2%), that Plaintiff—through its 30(b)(6) representative—agrees that reasonable investors would expect sub-managers to receive such fees, and that it was disclosed to investors both that Defendant Conrad acted as a sub-manager of some fund investments and also that sub-managers generally charge fees measured by a percentage of the value of the assets they manage. See Mashburn Dep., Dkt. No. [69-1] at 89:20-92:15, 93:3-13, 96:18-22; Conrad Decl., Ex. 1, [66-2] at 18. Therefore, there is sufficient record evidence supporting both parties' positions as to whether Defendant Conrad's sub-manager role and accompanying fee were disclosed to investors to preclude summary judgment on the omission element of each count arising from this category.

     b.  Whether any potential nondisclosure was material

     The dispute of fact as to whether the sub-manager position and fee were disclosed also creates a genuine dispute as to materiality. That is, the materiality determination "requires delicate assessments of the inferences a 'reasonable

33

shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." TSC Indus., Inc., 426 U.S. at 450. Whether a reasonable investor should have inferred from notations of "TDC managed assets" that Defendant Conrad had appointed himself a sub-manager and taken an additional fee on top of the fees he already received in connection with that role is best left to the jury to determine. And even if it were established that Defendants Conrad and FMC omitted the sub-manager appointment and related fee, the Court cannot say that such omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality[.]" Id.

Further, the Court rejects Defendants' argument that even if the appointment and fee were not disclosed, no conflict of interest can be established absent evidence of investor loss. By acting as both the president of General Partner FMC and as a sub-manager, Defendant Conrad was responsible for valuing at least a portion of the assets that he managed and was competing with other sub-managers of the funds. See Dkt. No. [67] ¶¶ 483-84; see also Capital Gains, 375 U.S. at 185-195 (explaining that actual injury to a client need not be shown under Section 206(1)). The purpose of the Investment Advisers Act is to permit an investor to evaluate potential "overlapping motivations, through appropriate disclosure, in deciding whether an adviser is serving 'two masters' or only one, 'especially if one of the masters happens to be economic self-interest.'" Id. at 196 (quoting United States v. Miss. Valley Generating Co., 364 U.S. 520,

34

549 (1961)). And as to Counts I, II, and IV under the Securities Act and Securities Exchange Act, evidence of actual investor loss is not necessary to establish materiality—i.e., that the disclosure of such potential conflict of interest would have been important to a reasonable investor's decision whether to invest in the funds.[20] "Materiality is determined in light of the circumstances existing *at the time* the alleged misstatement [or omission] occurred." <u>ZPR Inv. Mgmt.</u>, 861 F.3d at 1250 (internal quotations and citation omitted). Thus, even if the record is devoid of evidence of investor loss as a result of Defendant Conrad's sub-manager self-appointment, a reasonable juror could still find the nondisclosure of the appointment and fee was material at the time investors first reviewed the offering materials and LPA. Therefore, taken together, the record evidence does not justify summary judgment for either party on any count arising from this alleged nondisclosure.

Accordingly, the Court **DENIES** both Plaintiff's and Defendants' motions for summary judgment with regard to all counts arising from this alleged nondisclosure by Defendants Conrad and FMC.

### C. <u>Redemption Practices</u>
*Counts I, II, IV, IX*

Defendants' alleged preferential redemption scheme forms an additional

---

[20] To prevail in a *private cause of action* under § 10(b), a plaintiff must show a "causal connection between a defendant's misrepresentation and a plaintiff's injury" as part of the reliance requirement. <u>See</u> <u>Stoneridge Inv. Partners, LLC v. Sci.-Atlanta</u>, 552 U.S. 148, 159 (2008). As already explained, however, an SEC enforcement action has no such reliance requirement.

and important part of this litigation. The SEC accuses Defendants of convincing investors to entrust the funds with millions of dollars only to institute a "freeze" of investors' redemption requests in February 2009 that was never formally lifted, while continuing to take redemptions for Defendants' own use and allowing Conrad family members and certain favored investors to do the same. See Dkt. Nos. [12] at 3-4; [67] ¶¶ 93, 96, 474.

As to all counts arising from this category, Defendants argue that because the LPA permits Defendant Conrad broad discretion to limit redemptions, and this permission was disclosed to all investors, any oral representations Defendant Conrad made to the contrary cannot form the basis for a fraud claim. Dkt. No. [68-1] at 23-24. Similarly, Defendants contend any oral misrepresentations Defendant Conrad made to potential investors that they would be able to easily withdraw invested funds cannot support a fraud claim given the merger clause in the LPA, as well as the forward-looking, "hopeful" nature of the statements at issue. Id. In support, Defendants cite to various cases standing for the propositions that (1) a fraud claim cannot be based on mere statements of opinion or expectation, unfilled predictions, or erroneous conjecture, see, e.g., Next Century Comm'ns Corp. v. Ellis, 318 F.3d 1023, 1028 n.3 (11th Cir. 2003); Roca Properties, LLC v. Dance Hotlanta, Inc., 761 S.E.2d 105, 114 (Ga. Ct. App. 2014); and (2) that when an investor has signed a written agreement containing a merger clause, that investor cannot bring a fraud claim based on prior or contemporaneous representations that contradict the written agreement. See,

e.g., First Data POS, Inc. v. Willis, 546 S.E.2d 781, 784-85 (Ga. 2001). Defendants do not address any of the other elements of the counts at issue in their briefing on either motion. See Dkt. Nos. [68-1] at 28-30; [66] at 28-30.

   i.   *Whether Plaintiff has stated a claim for fraud arising from Defendants' redemption practices*

As already discussed, reasonable reliance is not an element of any of Plaintiff's claims, and thus Defendants' citations to opinions that hinge on the failure of private litigants to show reasonable reliance are not dispositive here. Moreover, the Eleventh Circuit has made clear that in SEC enforcement actions, a "broker's statements [to the hypothetical reasonable investor] about the relative merit (and lack of risk) of certain investments in deciding among different investment options" can be held material without considering "whether the individual investor's *reliance* on his broker's statements is reasonable." Morgan Keegan & Co., 678 F.3d at 1249 n.19. The Eleventh Circuit has "never held that, 'regardless of the circumstances, an investor is always precluded from recovering under Rule 10b–5 if the misrepresentations upon which the investor relied were oral and conflict in some way with contemporaneous written representations available to the investor.'" Id. at 1250 (quoting Bruschi v. Brown, 876 F.2d 1526, 1529 (11th Cir. 1989)). In other words, a finding of materiality in an SEC enforcement action is not precluded even where a private action on the same facts could not succeed due to a lack of reasonable reliance.

Nonetheless, some of the same considerations applicable to a reasonable reliance analysis also apply to the materiality of forward-looking statements under the "bespeaks caution" doctrine. Merch. Capital, 483 F.3d at 767. That is, "[w]hen an offering document's projections are accompanied by meaningful cautionary statements and specific warnings of the risks involved, that language may be sufficient to render the alleged omissions or misrepresentations immaterial as a matter of law." Saltzberg v. TM Sterling/Austin Assocs., 45 F.3d 399, 400 (11th Cir. 1995). See also Merch. Capital, 483 F.3d at 767-68. However, "'[s]tatements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact . . . or if the speaker does not genuinely or reasonably believe them.'" Id. at 766-67 (quoting Kowal v. IBM Corp. (In re IBM Corp. Sec. Litig.), 163 F.3d 102, 107 (2d Cir. 1998)).

Here, the undisputed evidence shows that Defendant Conrad both supported statements regarding redemptions with specific statements of fact that were false and also told potential investors that they would be able to withdraw funds within 60 days or sooner when it was not reasonable to believe such a projection due to long-outstanding redemption requests. Dkt. Nos. [64-2; 67] ¶¶ 85-88,[21] 90, 99-100, 130-31, 154-55, 158,171; [64-7] at 35; [64-10] at 61. When

---

[21] These citations correspond to Defendant Conrad's representations to specific investors that they would be able to redeem their investments "at any time," within "a little time," "within 24 hours," or "within 60 days," or that an investor "would have no difficulty getting his investment back if he needed it." Defendants

Defendant Conrad made these representations, he was aware that other investors in the funds had been waiting several years for outstanding redemptions. For example, Defendants do not dispute that on May 8, 2014, Billy Clay invested $350,000 in World Fund II after Dr. Conrad told him he could withdraw his funds with one month's notice. Id. ¶ 437. At the time of Mr. Clay's investment, investor Jan Duncan's request to redeem the entirety of her account had been outstanding for over five years, since February 3, 2009, despite her repeated requests for redemption.[22] Id. ¶ 95; see also id. ¶¶ 102, 107, 139, 293, 302 (admitting Ms. Duncan again requested complete redemption on April 10, 2009, September 18, 2009, June 1, 2010, June 9, 2010, October 4, 2012, and October 14, 2012). When Mr. Clay himself later requested redemption in January 2017 and Dr. Conrad told him that redemption would not be possible at that time, Mr. Clay reminded Dr. Conrad of the earlier representation that he could redeem with

---

objected to these statements of fact as irrelevant due to the merger clause in the LPA. See Dkt. No. [67] ¶¶ 85-88. However, Defendants do not deny the substance of these statements. See id. The Court overrules the relevance objection because reasonable reliance is not an element of the claims before the Court. And even if the merger clause may bear on the materiality of the statements, they are nonetheless relevant to the determination of whether Defendants made misrepresentations in the first instance, and the timing of the misrepresentations is relevant to the determination of whether they were made with scienter. Therefore, the Court treats these facts as undisputed.

[22] It is undisputed that Ms. Duncan was permitted one redemption of $85,000 in January 2010 and another redemption of $2,000 in September 2011 from WOF Master, but her February 2009 request to redeem the entirety of her account, initially valued at $303,821.90, was not fulfilled until February 2016. Dkt. No. [67] ¶¶ 95, 112, 222, 460.

a month's notice. Id. ¶¶ 468-69. Dr. Conrad responded, "that was then and this is now." Id. ¶ 470. Yet the undisputed evidence shows that the representation that investors could redeem with a month's notice was not true either "then" or "now."

Similarly, Defendants admit Dr. Conrad told investor Paul Leber on June 26, 2013 that he would be able to easily withdraw his funds, even though there were several outstanding redemption requests from other partners at the time. Dkt. Nos. [64-2, 67] ¶¶ 367-68. Indeed, Defendants admit that despite the purported freeze on redemptions since 2009, all Investor Fact Sheets dated after 2009 state that the funds' redemption policy is monthly. Dkt. No. [67] ¶ 474. Therefore, the merger clause does not save Defendants from a finding that they made material misrepresentations about liquidity risk to investors in both direct communications between potential investors and Defendant Conrad and in investor fact sheets.

It is also undisputed that Defendant Conrad sent an email to WOF partners on February 9, 2009 stating that "[b]ecause of a lack of availability of cash for the next few months, we have had to postpone partner redemption distributions until this July[.]" Dkt. Nos. [67] ¶ 96; [64-6] at 34. Yet Defendant FMC withdrew $300,000 from WOF that very same month. Dkt. No. [64-6] at 37; see also Conrad Dep., Dkt. No. [60] at 228:17-230:12. Further, Defendants do not dispute that Dr. Conrad sent an email to investors on July 25, 2010 with the subject line "WOF Liquidity," stating that there would be no redemptions for the remainder of the year, and that there may be redemptions in 2011, "but don't plan on it."

Dkt. Nos. [67] ¶ 154; [64-5] at 88. That was untrue. Redemptions were permitted to some investors throughout the rest of 2010 and into 2011, and Defendant Conrad never corrected the misrepresentation. See Dkt. No. [67] ¶¶ 158-163, 165-170 (admitting to ten redemptions by Stuart Conrad, FMC, the Conrad Family Foundation, and two other investors between August and November 2010); Conrad Dep., Dkt. No. [60] at 223:4-22 (admitting Stuart Conrad was permitted monthly redemptions in 2010 because "redemptions weren't really frozen"); Dkt. No. [64-5] at 158-65 (showing Stuart Conrad redemptions every month between March and November 2010); Conrad Dep., Dkt. No. [60] at 218:6-10 (explaining that "maybe [he] never notified anybody" that there were exceptions to the July 2010 redemption suspension, "but [he] did make exceptions."); Dkt. No. [67] ¶ 169 (admitting in substance that Defendant Conrad sent an email on December 14, 2010 addressed to WOF investors stating that the funds would be able to "begin to honor all redemption requests" at least partially during the summer of 2011); ¶¶ 172-178, 180-186 (admitting redemptions permitted between January and March 2011); ¶¶ 190-194 (admitting 5 redemptions on April 4, 2011); ¶¶ 197-203 (admitting 7 redemptions by different investors on April 27, 2011).

Dr. Conrad compounded the July 25, 2010 misrepresentation by telling investors Douglas Scheller and Michael Gerzanics that Conrad's family remained fully invested in the funds when in fact his family members had been permitted to redeem. Dkt. No. [67] ¶ 131; Scheller Decl. ¶ 11, Dkt. No. [64-9] at 212; Gerzanics Decl. ¶ 7, Dkt. No. [64-9] at 180-81. Defendant Conrad also misled

investor Jan Duncan—who had been seeking redemption since February 2009—
by telling her in a June 17, 2010 email that he could not honor her continuing
redemption requests because, "legally, we cannot favor a partner regardless of the
circumstances." Dkt. No. [64-7] at 35; [67] ¶ 143. Dr. Conrad admitted during his
deposition that this representation was "not correct" and, in response to two
separate questions asking whether he did in fact favor some partners over others,
he answered, "Yes." Conrad Dep., Dkt. No. [60] at 247:15-18; 275:19-276:16.
Defendant Conrad also misrepresented to Jan Duncan in an April 1, 2011 email
that "[n]o partners have cashed in since June 2009." Dkt. No. [64-10] at 61. See
also Dkt. No. [67] ¶ 391.

As another salient example, Defendants do not dispute that Dr. Conrad
sent a notice to investors on March 23, 2014 stating that the government had
frozen the funds' disbursements in relation to a Ponzi scheme in which the funds
had invested years earlier. Dkt. No. [67] ¶ 422. Consistent with this
representation, Dr. Conrad sent an email to Mr. Scheller on April 13, 2014 stating
"[w]e are legally restricted by government appointed lawyers from disbursing
your funds to you. Period, period." Id. ¶ 433. Dr. Conrad explains in his
Declaration that WOF was sued in 2010 by an SEC Receiver to recover the funds
WOF earned through its investments in the Ponzi scheme, and a judgment
against WOF was entered in December 2013 requiring it to repay those amounts.
Dkt. No. [68-2] ¶¶ 26-33. Therefore, according to Dr. Conrad, he stopped
permitting redemptions in reliance on representations by counsel for the

Receiver that allowing investors to redeem prior to paying the judgment would result in an additional lawsuit for fraudulent transfer. Id. ¶¶ 37-38. Yet Defendants do not dispute that between the March 23, 2014 notice and the April 13, 2014 email to Mr. Scheller, various investors were permitted a total of ten redemptions, and Dr. Conrad continued to allow redemptions to some investors even after sending the Scheller email, including allowing Defendant FMC a $59,513.38 redemption on May 13, 2014. Dkt. No. [67] ¶¶ 423-32, 434, 438. During the same period, on both December 26, 2013 and June 19, 2014, Dr. Conrad's son and World Fund II Administrator Dale Conrad told an investor there was no liquidity available to honor his redemption request. Id. ¶¶ 398, 438. Defendants also do not dispute that a BVI offering memorandum dated July 1, 2014 provided that shareholders could redeem upon written notice to the General Partner or Administrator as of the last business day of the calendar month in which the redemption request is received. Id. ¶ 456.

Throughout their Response to Plaintiff's Statement of Material Facts, in order to support denials of certain facts or to assert the irrelevance of certain false statements Defendant Conrad made to investors, Defendants repeatedly rely on the disclosures in their LPA and Offering Documents that the General Partner had discretion to limit redemptions and to make exceptions to suspensions. See Dkt. No. [67] ¶¶ 99-100, 130, 144, 155, 157, 337, 367, 472. For example, Defendants do not dispute that Defendant Conrad sent the February 9, 2009 email discussed above stating that partner redemptions would be suspended until

July 2009. Id. ¶ 96. However, Defendants purport to dispute the related facts that

"Conrad never told investors that he made exceptions to the [February 2009]

suspension on redemptions" and "Conrad never made it clear to investors

generally that some investors, including [his son, Stuart] Conrad, were able to

redeem their investments." Id. ¶¶ 99, 100. In support of these denials,

Defendants cite to the January 2013 World Fund II LPA, which set forth

Defendant Conrad's powers as the General Partner. In particular, the LPA

disclosed to investors that the General Partner retained "sole discretion" to make

or withhold distributions from the Partnership to the limited partners, as well as

to suspend redemptions on a temporary basis and to make exceptions to any such

suspensions "due to any hardships of a Limited Partner or the contractual

requirements of a Limited Partner[.]" Dkt. No. [66-3] at 3, 4, 9, 11. Similarly,

Defendants' briefing relies solely on these disclosures to establish that no fraud

liability can attach to this category of conduct. See Dkt. Nos. [68-1] at 28-30; [66]

at 28-30.

However, disclosure of a discretionary power is not the same as disclosure

of having exercised that power. While Defendant Conrad may have disclosed that

he had the power to allow exceptions to the suspension, citation to such

disclosure does not create a genuine dispute as to the allegation that he never

disclosed that he *did* make exceptions for some partners. More importantly, it

does not transform any of Defendant Conrad's affirmative misrepresentations to

investors about what was happening in real time—described above—into accurate

statements, because none of the documents on which Defendants rely discloses the truth of those specific matters. Therefore, Defendants' denials premised on disclosures in the LPA are ineffective to raise a genuine dispute as to SEC UMF Nos. 99-100, 130, 144, 155, 157, 337, and 472, all of which deal with omissions of what Defendants *were in fact doing or would in fact do*, rather than omissions of what Defendants *had the power to do*.[23] These disclosures thus do not render immaterial Defendant Conrad's numerous misrepresentations regarding redemptions.

  *ii.  Whether the misrepresentations were material*

   While materiality is ordinarily left to the trier of fact, repeated misrepresentations to investors that redemption would be possible with a month's notice despite having told other investors during the same time period that redemptions were frozen or impossible due to lack of liquidity are material as a matter of law. "To warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." Merch. Capital, 483 F.3d at 747. Any reasonable investor would attach importance to these representations, particularly given that the truth of the matter was that redemption requests of many investors took years to fulfill. See, e.g., Dkt. No.

---

[23] Moreover, Defendants' relevance objection to SEC UMF No. 367 is overruled for the reasons explained supra note 21.

[67] ¶ 460 (admitting Ms. Duncan's redemption request was made in February 2009 and fulfilled in February 2016); ¶ 461 (admitting Mr. Scheller's redemption request was made in April 2011 and still largely unfulfilled as of March 2018); ¶ 462 (admitting Mr. Turner's September 2011 redemption request took two years to fulfill); ¶ 464 (admitting Mr. Stackhouse was still owed $156,208.92 from his World Fund II account as of March 2018 despite making full redemption request in February 2015).

Based on the foregoing, the Court finds that Plaintiff has established as a matter of law that, over the course of many years, Defendants repeatedly made material misrepresentations regarding the redemption practices of the funds to actual and potential investors in email communications, investor fact sheets, and other offering memoranda. That conduct is prohibited under Sections 17(a)(1) and (a)(2) of the Securities Act, as set forth in Counts I and II, Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder, as set forth in Count IV, and Rule 206(4)-8(a)(1) of the Investment Advisers Act, as set forth in Count IX.

As stated above, Defendants have offered no arguments in their briefing on either motion to rebut Plaintiff's arguments and supporting evidence on the other elements of these counts, including use of instrumentalities of interstate commerce or the mails (Counts I, II, and IV), negligence (Counts II and IX), and scienter (Counts I and IV). See Dkt. Nos. [68-1] at 28-30; [66] at 28-30. Accordingly, Plaintiff's motion for summary judgment on Counts I, II, IV and IX arising from Defendants' fraudulent redemption practices is **GRANTED**.

46

Defendants' motion for summary judgment on the same Counts is **DENIED.**

### D. <u>Nondisclosure of Family Loans</u>
  *Counts VI, VII, IX against Defendants Conrad and FMC*
  Defendants admit that in February 2010, Defendant Conrad used WOF Master funds to pay approximately $18,000 in credit card bills incurred by his daughter-in-law, the wife of his son Dale Conrad. Dr. Conrad paid the money from the WOF Master account in return for a promise by his daughter-in-law to repay the money with 12 percent interest. Dkt. No. [67] ¶ 487. Defendant FMC later purchased the loan from WOF Master. <u>Id.</u> ¶ 488; <u>see also</u> D. Conrad Testimony at 106:12-107:14, Dkt. No. [64-3] at 201-02. Defendants further admit that on July 1, 2013, Dr. Conrad caused WOF Master to make an interest-free loan of $26,499 to a car dealership to allow Dale Conrad to purchase a truck. Dkt. No. [67] ¶ 490; <u>see also</u> Dkt. No. [64-5] at 99. The parties dispute whether the truck was purchased for a business purpose or for Dale Conrad to use on vacation. Dkt. Nos. [68-16] ¶ 9; [64-2] ¶ 491. The truck loan was repaid in under two months. Dkt. No. [74] ¶ 8. Defendants admit neither loan was disclosed to investors. Dkt. No. [67] ¶¶ 489, 492. Plaintiff alleges these loans constituted a breach of Defendant Conrad's and FMC's fiduciary duty to the funds through the misuse of fund assets to benefit members of the Conrad family over the funds' actual and prospective investors, thus violating Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act. Dkt. No. [64-1] at 23-24. "The provisions of Sections 206(1) and 206(2) have been interpreted as substantively indistinguishable from Section 17(a) of the Securities Act, except that Section

47

206(1) requires proof of fraudulent intent, while Section 206(2) simply requires proof of negligence by the primary wrongdoer." SEC v. Pimco Advisors Fund Mgmt. LLC, 341 F. Supp. 2d 454, 470 (S.D.N.Y. 2004).

Both parties seek summary judgment on Counts VI, VII, and IX arising from these loans. Defendants contend that the offering documents "disclose that the Funds may make loans (including on an unsecured basis), that the General Partner has broad discretion to make all investment decisions, and that the individual assets held by the Funds are not disclosed to the partners." Dkt. No. [68-1] at 16. Further, Defendants argue that Plaintiff, through its 30(b)(6) representative, conceded that the LPA permitted such loans and that there are no restrictions against making loans to family members. Id. Finally, Defendants note the loans were repaid in full and there is no record evidence that any investor suffered loss related to the loans. Id. at 16-17. Therefore, Defendants aver the nondisclosure of these specific loans is neither a fraudulent omission nor material. Id. at 17.

Plaintiff argues, first, that there is at least a genuine issue of material fact as to whether the LPA permits the loans in question given the LPA provision requiring full disclosure of loans that personally benefit the General Partner and requiring such loans to be at least as favorable to the partnership as an arm's-length commercial transaction would be. Dkt. No. [73] at 14 (citing to Pl's Ex. 124 at 23, Dkt. No. [64-7] at 140). Plaintiff contends it is "indisputabl[e]" that the interest-free loan to Dale Conrad does not meet that standard. Dkt. No. [73] at 14.

Defendants reply that Plaintiff misreads the relevant provision, which concerns "use of the Partnership's assets for the General Partner's personal benefit[,]" because Dale Conrad is not a General Partner or an affiliate of the General Partner. Dkt. No. [76] at 3.

Second, Plaintiff argues that even if the LPA does permit such loans, the failure to disclose them constitutes fraud because both loans were undisclosed conflicts of interest and the nondisclosure of a conflict of interest is material as a matter of law. Dkt. No. [73] at 15 (citing Steadman, 603 F.2d at 1130). In particular, Plaintiff argues that "diverting funds away from the Fund, even for a short period of time, always carries with it the risk that some or all of the money will be lost or at least unavailable for some period of time." Dkt. No. [64-1] at 24 (quoting SEC v. Mannion, 789 F. Supp. 2d 1321, 1341 (N.D. Ga. 2011)).

For the same reasons explained above concerning the Investment Advisers Act claims arising from the nondisclosure of Conrad's sub-manager appointment and related fee, neither party is entitled to summary judgment on these claims. In short, the materiality of these nondisclosures is a matter for the jury.

First, Defendants have admitted the specific loans were not disclosed. Therefore, the Court rejects their argument that a provision in the partnership documents permitting the General Partner to enter into any "contracts[,] agreements, undertakings, and transactions with . . . any other Partner or any shareholder . . . or with any person . . . having any business[,] financial[,] or other relationship with the General Partner" somehow transforms the loans into

"*disclosed*, permitted act[s.]" Dkt. No. [76] at 4 (quoting Dkt. No. [68-4] at 6) (emphasis added). Moreover, whether or not *the LPA* permitted such loans does not answer the question of whether *the Investment Advisers Act* requires the disclosure of such loans. A reasonable juror could find that Defendants FMC and Conrad breached their fiduciary duty to both the funds and to the investors by using fund assets to pay personal debts and expenses of Dr. Conrad's family members without disclosing such use.

However, Plaintiff's citations to <u>Steadman</u> and <u>Mannion</u> do not support granting summary judgment in its favor either. In <u>Steadman</u>, the court in fact distinguished <u>TSC</u> from the case at bar specifically because <u>TSC</u> arose on the plaintiff's motion for summary judgment, "i.e., whether the omission was material as a matter of law." 603 F.2d at 1130. The court went on to emphasize that in <u>TSC</u>, the Supreme Court "reaffirmed . . . that the issue of materiality is a mixed question of law and fact and that divining the significance of the inferences a reasonable investor would draw from a given set of facts is peculiarly within the competence of the trier of fact." <u>Id.</u> Similarly, <u>Mannion</u> was before the court on a motion to dismiss, and the court merely held that "a reasonable factfinder *could conclude* that it is material that the advisors of the Fund used Fund assets for purposes other than for the benefit of the Fund." 789 F. Supp. 2d. at 1341 (emphasis added). That conclusion does not compel summary judgment in Plaintiff's favor.

The Court finds a reasonable juror could conclude there is insufficient

evidence to establish materiality where a reasonable investor would arguably anticipate such loans based on the information in the offering materials, the loans were repaid quickly and one was repaid with interest, and nothing in the record shows the loans substantially affected liquidity. Accordingly, it is possible a reasonable investor, in making his investment decision, would consider such relatively small loans "essentially useless" information. It is also possible an investor would find such conduct inappropriate by an investment advisor and indicative of a larger privileging of Defendants' own self-interest over their fiduciary duty, thereby greatly affecting an investor's investment decision and making the nondisclosure material. In other words, the Court cannot determine the materiality of the nondisclosure as a matter of law. Thus, both parties' motions seeking summary judgment on Counts VI, VII, and IX arising from the nondisclosure of the loans to family members are **DENIED**.

### E. Fraudulent Purchases
### *Counts VI, VII, and IX against Defendants Conrad and FMC*

Finally, Plaintiff has brought claims under Sections 206(1), (2), and (4) of the Investment Advisers Act based on Defendant Conrad's titling of certain fund assets in his own name. These assets include two soybean farms in Uruguay and approximately $88,000 worth of precious metals. Dkt. No. [1] at ¶¶ 67-69. In its Complaint, Plaintiff contends Defendants Conrad and FMC violated the Investment Advisers Act by failing to disclose that Conrad held title personally to assets purchased with investor funds. Id. ¶ 70.

Defendants argue that the LPA "permits the General Partner to possess partnership property, including through a nominee, unless it is 'for other than a Partnership purpose.'" Dkt. No. [76] at 9; see also [66-3] at 5, 6. Defendants contend "the exercise of disclosed contractual powers is not fraudulent, is not an omission, does not form the predicate for any assertion of scienter and is certainly not material." Dkt. No. [76] at 8. Therefore, because there is no record evidence that any of the assets Dr. Conrad held in his own name were used for anything other than a "Partnership purpose," Defendants argue summary judgment in their favor is proper on all fraud counts arising from these purchases. Plaintiff does not seek summary judgment on these counts.

While Defendants refer to the absence of a showing of materiality or scienter in a conclusory fashion, their briefing advances substantive argument solely on the question of whether the record evidence shows an omission in the first instance. The Court finds Defendants are not entitled to summary judgment on these grounds. As discussed above, the purpose of the Investment Advisers Act is to require disclosure of all possible conflicts of interest to allow clients and investors to make informed investment decisions. And again, disclosure of a power is not the same as the disclosure of having exercised that power. While the record shows that the World Fund II LPA disclosed that assets owned by the Partnership "may be registered in the name of the Partnership or in the name of a nominee," a reasonable juror could nonetheless find that Defendants Conrad and FMC were specifically required by their fiduciary duty to investors to disclose that

52

Dr. Conrad himself possessed certain valuable assets, purchased with money from the funds, in his own name. Moreover, a reasonable juror could find from the record evidence that even if the LPA did permit Defendant Conrad to possess Partnership property for "a Partnership purpose," he did not possess those assets for such a purpose. For example, Defendants admit that Defendant Conrad held at least some of the precious metals at his home address, and that in an email discussing the purchase of one of the soybean farms, Dr. Conrad stated that he expects "the house will be at my disposal" within 60 days of closing. Dkt. No. [77] ¶¶ 54, 58. For that reason, Defendants' motion for summary judgment on the counts arising from this category is **DENIED**.

## IV.   CONCLUSION

Based on the foregoing, Plaintiff's Motion for Partial Summary Judgment [64] is **GRANTED IN PART** and **DENIED IN PART**, and Defendants' Motion for Summary Judgment [68] is **DENIED.**

Specifically, Plaintiff's motion for summary judgment as to Counts I, II, and IV against Defendants Conrad and FMC arising from the nondisclosure of Defendant Conrad's disciplinary history is **GRANTED** to Plaintiff and **DENIED** to Defendants Conrad and FMC. Further, Defendant Conrad and FMC's motion for summary judgment as to Counts I, II, IV, and IX arising from the alleged "auditor" and historical performance misrepresentations and as to Count IX arising from the disciplinary history nondisclosure is **DENIED.**

Both parties' motions for summary judgment on Counts I, II, IV, VI, VII,

and IX against Defendants Conrad and FMC arising from the alleged nondisclosure of Defendant Conrad's sub-manager appointment and related compensation are **DENIED**.

Plaintiff's motion for summary judgment on Counts I, II, IV, and IX arising from Defendants' fraudulent redemption practices is **GRANTED**. Defendants' motion for summary judgment on the same Counts is **DENIED.**

Summary judgment on Counts VI, VII, and IX arising from the nondisclosure of family loans is **DENIED** to both parties.

Finally, Defendants Conrad and FMC's motion for summary judgment on Counts VI, VII, and IX arising from the allegedly fraudulent purchases of fund assets in Defendant Conrad's name is **DENIED.**

The issuance of this Order does not impact the stay that is currently in place relating to the government shutdown. In other words, all deadlines relating to this case and this Order are still subject to the current stay.

It is so ordered this 17th day of January, 2019.


LEIGH MARTIN MAY
UNITED STATES DISTRICT JUDGE